**BEFORE THE OFFICE OF ADMINISTRATIVE HEARINGS**
**STATE OF OREGON**
**for the**
**OREGON DEPARTMENT OF EDUCATION**

| | | |
|---|---|---|
| IN THE MATTER OF THE EDUCATION OF | ) | **FINAL ORDER** |
| | ) | |
| **STUDENT and EUGENE SCHOOL** | ) | Case No.: DP 14-113 |
| **DISTRICT 4J** | ) | |

**HISTORY OF THE CASE**

On September 26, 2014, Student's parents filed a request for a due process hearing with the Oregon Department of Education Office of Student Learning and Partnerships. The parties participated in a resolution session on October 10, 2014, but did not resolve the dispute.

On September 29, 2014, the Oregon Department of Education (ODE) referred the case to the Office of Administrative Hearings (OAH). The OAH assigned Senior Administrative Law Judge (ALJ) Alison Greene Webster to conduct the due process hearing and issue a Final Order in this case. ALJ Webster presided over a prehearing conference on November 4, 2014. The Parents participated in the conference through their attorney, Melissa Wischerath. The Eugene School District (District) participated through their attorney, Richard Cohn-Lee. During the conference, the parties agreed to extend the decision deadline to a date certain (March 23, 2015) pursuant to ORS 343.167(5). The parties also agreed to hold the hearing January 26 through 29, 2015 in Eugene, Oregon.

On January 12, 2015, the District filed a motion in limine, seeking to limit the scope of the hearing. On January 20, 2015, the Parents filed an opposition to the District's Motion. On January 22, 2015, ALJ Webster held an additional prehearing conference. Attorney Melissa Wischerath appeared for the Parents and Attorneys Nancy Hungerford and Joel Hungerford appeared for the District. During the conference, the parties presented oral argument on the District's motion in limine and discussed logistics for the hearing with the ALJ. The ALJ denied the District's motion.

The hearing was held as scheduled before ALJ Webster on January 26 through 29, 2015 at the District's offices in Eugene, Oregon. Attorney Melissa Wischerath represented the Parents. Attorneys Nancy Hungerford and Joel Hungerford represented the District. The District provided a court reporter for the hearing. Naegeli Reporting prepared written transcripts of the hearing sessions. At the Parents' request, the hearing was closed to the public.

The District presented its case first. The following witnesses testified on the District's behalf: Cheryl Linder, Director of Education Support Services for the District; Katherine "KC" Clark, Education Administrator for the District. The District called Rebecca Ray, Client

Services Coordinator Supervisor for the therapeutic school attended by Student and Susan Schueller, Instructional Aid, as rebuttal witnesses.

The following witnesses testified on the Parents' behalf:  Ingrid Bodtker, English teacher; Jericho Schwab, Assistant Principal; Stephanie Cannon, Assistant Principal; Laurene Larson, School Counselor; Rebecca Gourgey, Special Education teacher; Randy Bernstein, Principal; Student; Heather Beard, Special Education Consultant; Chris Stober, Autism Consultant; Karen Apgar, School Psychologist; Kim Reinhardt, Behavioral Consultant; Etan Milner, Program Therapist at the therapeutic school; Monica Bounds, Autism Specialist; and Mother.

At the close of the hearing, the record was left open for receipt of the final hearing transcript and the parties' written closing arguments.  Naegeli Reporting provided the completed transcript on February 10, 2015.  The Parents' written closing brief was received on February 23, 2015 and the District's written closing brief was received on March 2, 2015.  The Parents were granted leave to file a response brief, and that brief was received on March 9, 2015.  The hearing record closed on March 9, 2015.

## STIPULATIONS

In the Due Process Complaint, the Parents raised the following issues, which were set out in the Notice of Hearing and Rights:

(1)    Whether the District denied student a free and appropriate public education (FAPE) during the 2012-2013 and 2013-2014 school years by failing to comply with the IDEA's Child Find duty, failing to respond to the Parents' requests for evaluation, failing to identify Student as eligible for special education, and failing to comply with written notice obligations;

(2)    Whether the District is responsible for compensatory education dating back to September 2012 when the District knew, or should have known, that Student had a disability;

(3)    Whether the Student's absences were a manifestation of Student's disability and the District's failure to provide individualized special education and appropriate accommodations for Student;

(4)    Whether the District violated the IDEA by failing to provide the Parents with prior written notice as required under OAR 581-015-2310, which denied them the opportunity to meaningfully participate in Student's education; and

(5)    Whether the District harassed and retaliated against Student and the Parents and, if so, whether the District is responsible for providing continuing mental health services to Student to allow Student to access Student's IEP and educational placement.

At the outset of the hearing, the entered into the following stipulations which narrowed

the scope of the litigation:

ISSUE (1):    The District denied Student a FAPE during the 2012-2013 and 2013-2014 school years.

ISSUE (2):    The District's Child Find duty was triggered on September 10, 2012.

ISSUE (3):    With the exception of absences of 23 days during the spring of 2013 in dispute, Student's absences during the 2012-2013 and 2013-2014 school years were a manifestation of Student's disability.  Student's formal academic records shall be modified to reflect zero absences (except for the 23 days during the spring of 2013 in dispute) and a comment of "absences related to disability are not recorded."  Student's transcript will not reflect any course at [the local high school] with an "F," "No Pass," "Withdraw," or "WF."

ISSUE (4):    The District denied the Parents opportunity to meaningfully participate in Student's education by not sending prior written notice (PWN) on November 19, 2012, February 11, 2013, May 10, 2013, November 4, 2013, December 5, 2013 and December 24, 2013.

ISSUE (5):    No stipulation.

ADDITIONAL STIPULATIONS REGARDING THE COMPENSATORY EDUCATION AWARD:

●    The District will provide as compensatory education the following to be delivered by a TSPC licensed special education professional:

570 hours – minus any offsets determined by the ALJ for Student's attendance at [the therapeutic school] during the Summer of 2014 or days absent during spring 2013 due to illness – in any of the areas of specially designed instruction (SDI) identified in Student's May 5, 2014 IEP (transition; study skills/organization; math; behavioral/social skills), with the distribution of hours among the four areas to be determined by the Parents.

●    Compensatory education will be made available to Student any time prior to Student reaching age 21.  The District will provide Student with the opportunity to take all of the classes or credits Student needs to obtain a standard high school diploma under OAR 581-022-1131.

●    Student successfully completed a total of 1.5 credit hours during the 2012-2013 and 2013-2014 school years.  The District will provide the Student the opportunity to recover the 10.5 credit hours towards a high school diploma that Student did not complete during the two school years in which Student was denied a FAPE.

●       The District will reimburse the Parents for transportation expense from the start of Student's attendance at the private school through September 25, 2014 at the rate of $.57.5 cents per mile.

●       If Student accesses online coursework as part of Student's schedule and/or as part of the delivery of compensatory services (SDI) the District will provide access to technology consistent with the process provided to all District students.

(Pre-Hearing Stipulations in Response to Student's Issues; *see also* Tr. Vol. I at 20-25, 32-34; Tr. Vol. IV at 42-46.)

## ISSUES

In light of the Stipulations set forth above, the parties agreed that the following issues remained in dispute for the hearing:

1.      Were Student's absences during 23 days in April and May of 2013 a manifestation of Student's disability rather than the result of physical illness and, if so, should Student's formal academic records be modified to so reflect?

2.      What compensatory education is necessary to remedy the denial of FAPE during the 2012-2013 and 2013-2014 school years?

3.      Should the District be required to provide mental health services to Student as a remedy for alleged retaliation or harassment suffered by Student and/or Parents during the 2012-2013 or 2013-2014 school year?

(Pre-Hearing Stipulations in Response to Student's Issues; Tr. Vol. I at 24-25.)

## EVIDENTIARY RULINGS

Exhibits D1 through D36 and D38 through D39, offered by the District, were admitted into the record without objection.  Exhibit D37 was admitted in its entirety over the Parents' objection to pages 7 through 9 of the exhibit.

Exhibits S1 through S44, offered by the Parents, were also admitted without objection.

## FINDINGS OF FACT

1.      Although Student reached the age of majority prior to the filing of the Due Process complaint, the Parents hold Education Power of Attorney and filed the complaint on Student's behalf.  (Stipulation.)

2.      Student, the Parents and Student's siblings moved to Eugene, Oregon in the fall of 2012, at which time Student enrolled in the District as a high school sophomore.  (Tr. Vol. II at

234-35.)  Student had not been evaluated for special education services at previous schools.  (Tr. Vol. IV at 65; Ex. D1 at 3.)

3.      In March 2012, prior to the move to Oregon, Student was admitted to a hospital psychiatric unit for treatment for depression, suicidal ideation and a recent suicide attempt. Student reported being bullied by three male students.  At that time, Student was diagnosed with Asperger's and an adjustment disorder with depressed mood.  Treatment records document severe stressors for Student, including bullying at school, impaired social interactions, two siblings with autism, and the mother being away in Oregon.  (Ex. S11 at 2-3, 8-10.)

4.      When the Parents registered Student in the District in September 2012, they disclosed to Assistant Principal John Wayland that Student had been hospitalized for an attempted suicide earlier in the year.  (Tr. Vol. IV at 63.)  The Parents similarly advised Assistant Principal Stephanie Cannon that Student had experienced emotional issues during previous school year.  (Tr. Vol. II at 35-36.)

5.      In September 2012, Student enrolled in seven courses at school as follows: Japanese I, US History, Elements of Chemistry, Drama 2: 2nd Year Acting; Concert Choir; Geometry; and English 10 Honors.  (Ex. S27 at 4; Tr. Vol. IV at 63-64.)  The Parents wanted Student placed in a more advanced Chemistry course, but the classes were overenrolled and Student's math level placed Student in the introductory course.  On September 6, 2012, the Parents requested that Student be withdrawn from the Elements of Chemistry class, advising the Assistant Principal that they planned to enroll Student in a private Chemistry class or have Student work with a tutor.  (Ex. S27 at 1-2.)

6.      During a student support team (SST) meeting on September 9, 2012, Student's school counselor Laurene Larson reported that although Student's mother reported that Student had been evaluated for an IEP in another state, the school had yet to receive confirmation or any further information in that regard from Student's prior school.  (Ex. S17.)

7.      During the fall of 2012, Student struggled with attendance, participation in class, completion of work and interaction with peers and others.  While Student attended Student's Japanese and US History classes, s/he began leaving campus or hiding out and missing classes later in the day.  Also, Student did not did not like the reading list and curriculum in Honors English class.  Student told the teacher, Ms. Bodtker, that s/he was ill and depressed.  (Ex. S24.)

8.      In early November 2012, aware that Student was struggling in some classes, Father contacted Student's Geometry teacher and asked that Student be withdrawn from Geometry.  (Ex. D26.)  Also, in response to school staff contacting the Parents with concerns about Student's absences, Father advised Assistant Principal Stephanie Cannon via email that his "interest is in the quality of [Student's] years at South – not attendance.  [Student's] last two years of public school have been very difficult." (*Id.*)

9.      In November 2012, the Father advised Ms. Larson that Student's home life was "chaotic" and the family was "challenging" due, in part, to the fact that two of Student's siblings were autistic and had special needs.  Ms. Larson related this information to the SST at the

November 19, 2012 weekly meeting.  She also noted that additional records had been requested from Student's prior school.  (Ex. S17; Tr. Vol. II at 82-84.)

10.    During the first part of the 2012-2013 school year, Student spent significant time at the school's health center.  Student met several times with the school's nurse therapist.  Student reported, among other things, that s/he had been mistreated by peers at Student's former school and that s/he had tried to harm him/herself several times after that.  Student discussed suicidal ideations and mentioned that s/he had had a past psychiatric hospital admission.  (Ex. 20.)

11.    In early 2013, Father contacted the school about obtaining a Section 504 plan for Student.  Among other things, the Parents wanted an accommodation for Student's peanut allergy.  The Parents also wanted Student to be able choose other books for Honors English class, because Student had did not like the subject matter of certain books on Ms. Bodtker's curriculum.  (Tr. Vol. IV at 74-81.)

12.    According to the SST meeting notes from February 11, 2013, Father was scheduled to attend the meeting to discuss a Section 504 plan for Student, but he did not show for the meeting.  (Ex. S17.)

13.    When a student is absent from class, the school will send an automated telephone call to the parents informing them of the student's absence.  At some point during the 2012-2013 school year, the Parents contacted the school and requested that they no longer receive the automated telephone calls advising them of Student's absences from school.  (Ex. D27.)  The Parents asked that the school provide notice of Student's absences via email instead of automated phone calls.  (Tr. Vol. IV at 69-70.)

14.    In early February 2013, Father emailed Student's US History, Biology, Math and English teachers asking for the reading and class assignments that Student had missed due to absences over the preceding days.  The teachers responded and provided Father with information on the missed assignments.  On February 4, 2013, Father advised Student's US History teacher that Student was still running a fever and would likely be out another day. (Ex. D29.)  Student continued to miss many classes throughout February and March.  (Ex. D28.)

15.    By mid-March 2013, Student had been dropped from most of his/her classes due to unexcused absences.  S/he remained enrolled in Honors English and US History.  (Ex. D28 at 10-15; Ex. S18 at 1.)

16.    The school sent a series of letters to the Parents regarding Student's unexcused absences and the legal requirement that Student attend school.  The school eventually referred Student's non-attendance to the Lane Education Service District (ESD) to have the truancy officer investigate the absences.  By letter dated March 20, 2013, Assistant Principal Cannon notified the Parents of the referral to the truancy officer.  The nonattendance letter advised that Oregon state law requires that all students attend school until graduation or until the age of 18 and that the continuation of Student's attendance problem could result in a citation issued to the Parents in the amount of $160.  The letter continued "the best way to remedy this situation is to

take whatever reasonable actions you can to ensure that your student attends all classes every day, except when excused for illness." (Ex. D32 at 1.)

17.     On the afternoon of March 20, 2013, Lane ESD Truancy Officer Mark Barr went to the family's home to deliver the nonattendance letter to the Parents. The Parents accepted the letter but were very angry that the truancy officer was at their door. The Parents advised Mr. Barr that any attendance conference would be in violation of Student's right to due process. The Parents also advised Mr. Barr of a scheduled meeting at the school on March 22, 2013 to address a Section 504 Plan for Student. (Ex. D32 at 3-4.)

18.     On March 22, 2013, Father attended a meeting with Assistant Principal Cannon and School Counselor Larson to discuss Section 504 accommodations for Student. Father asked that Student be excused from attending or participating in class and sought to have Student's grade based on testing only rather than participation in class. School staff advised the Father that Section 504 plans require that the student have an identified disability or impairment that reduces student's ability to access learning in the classroom setting. Staff also advised that Section 504 plans address accommodations that need to be made in the classroom and such plans were not typically used in connection with home schooling. Father left the meeting early and no Section 504 Plan was developed for Student.[1] (Tr. Vol II at 27-32, 44-48.)

19.     During April, May and June 2013, Student was absent from US History and Honors English class on more days than s/he was present. The school's attendance records indicate that, between April 8, 2013 and June 7, 2013, Student missed 36 days of Honors English class. Eighteen of those absences listed "sick" as the reason for the absence. One absence was listed as parent request and one absence was due to a family emergency. The school records for this same time period also show that Student missed 30 days of US History class, 20 of which were identified as "sick" days, one of which was listed as parent request and one due to family emergency. (Ex. D28 at 15-20.)

20.     From mid-April through May 2013, Father periodically contacted Student's teachers to report that Student was ill and to ask about the work that Student needed to do to stay current in class. (Ex. D30 at 3-5.)

21.     On May 10, 2013, Father contacted the District and requested an IEP meeting for Student. After calling and leaving a voice mail message, Father emailed Cheryl Linder, the District's Director of Education Support Services. He wrote, among other things, that Student "has a diagnosis of ASD." (Ex. D30 at 1.) Ms. Linder forwarded Father's request to the school's special education team and responded to Father as follows:

---

[1] At some point before or during the March 22, 2013 meeting, Ms. Cannon created a template for a 504 Plan for Student in the school's computer database. She did not complete the template because the meeting ended without any 504 Plan developed for Student. (Ex. S19; Tr. Vol. II at 199-200.) At the end of the 2012-2013 school year, the District changed over to a different student data management system. The incomplete template and the transition to a new data management system contributed to the later confusion and misunderstandings over whether Student had a 504 Plan in place in the spring of 2013. (*Id.*)

I will convey your request to the Special Education team at South.  I did a quick check of our student information system and it does not appear that [Student] is currently eligible for special education services.  In order to determine if we would move forward with an evaluation for special education, we follow a process of looking at progress for [Student].  The team will begin here and contact you to let you know what the next steps would be.

(Ex. D30 at 1.)

22.    From May 10, 2013 through May 15, 2013, school staff members were in email contact with each other regarding the course of action to take in response to the Parents' request for special education services for Student.  Late in the day on Friday, May 10, 2013, special education teacher Rebecca Gourgey emailed Assistant Principal Cannon, and others as follows:

Hi Steff,
Below is the email Cheryl sent us.  [Student] is on a 504.[2]  Looks like [Student] started with us in December and is doing poorly.  [Student] is from [another state] and did VERY poorly there.  Not sure if you want to look into this and follow up.  Ty is away until the end of May so there will be no movement on it until her return.  B or J do you want to weigh in?  I followed up because [Student] is a tenth grader.

(Ex. S20 at 8.)

23.    On Monday, May 13, 2013, Ms. Cannon responded to Ms. Gourgey's email noting, in part:

The biggest problem is that [Student] does not attend school and parents seem very comfortable with that.  There was a history of same in [prior school].  Parent had issues when we tried to hold a 504 meeting and walked out.  I've done some truancy reports and still need to follow up with this.  I don't know what ASD is.

Laurene [Larson] has been working with this situation without much success, despite her efforts.  When I am back in the building on Weds, I'll talk with her.

(Ex. S20 at 8.)  Ms. Cannon copied others, including Ms. Larson and Ms. Linder on this email.  (*Id.*)

24.    A short time later, Ms. Gourgey responded to Ms. Cannon's email as follows:

Hi Stephanie,
Well a walk out makes it hard to follow through, huh?  ASD is Autism Spectrum

---

[2] At the time Ms. Gourgey wrote this email, she was not familiar with Student and had no firsthand knowledge regarding Student's education status or Student's need for accommodations in the classroom.  When asked about this email at hearing, Ms. Gourgey could not recall with any certainty who had told her (incorrectly) that Student had a 504 Plan.   (Tr. Vol. II at 123-26.)

*In the Matter of Student and Eugene School District*, DP 14-113
Final Order
Page 8 of 29

Exhibit 1
Page 8 of 29

Disorder.  Maybe we could talk more about this collectively and then invite
parents back?

(Ex. S20 at 8.)

25.     Later in the day, Ms. Larson included Julie Penton on the email communications
regarding Student.  Ms. Penton was, at the time, the nurse practitioner in the school's health
clinic who had met with Student and was familiar with Student and Student's family.  (Ex. S20
at 4.)

26.     On the morning of May 14, 2013, Ms. Gourgey responded to Ms. Larson's email
as follows:

> Hi Laurene,
>
> Thanks for the heads up.  The truth is, this child is not on an IEP.  [S/he] has a
> 504 plan so [s/he] doesn't have Sp Ed services.  Sounds like, from Steff, the
> family was edgy at best.  Ty Zeller comes back on Monday so we can wait to
> have her dig in a bit and then meet.
>
> I do feel as though someone should respond to Dad.  I am not sure my
> involvement other than I have mostly 10th graders on my caseload.  I am not even
> all that clear as to whether he is asking if his child is eligible for services.
>
> Steff, I know you are out right now, but when you return, can you give direction
> on this?

(Ex. S20 at 4-5.)

27.     Later that day, in an email to Ms. Gourgey, Ms. Penton wrote, in part, as follows:

> I had talked at length several months ago with this father about [Student].  He was
> irate that he hadn't been able to get anyone to help him get a 504 for [Student].
> Laurene was helping him look into that, as he was really wanting this.  His
> concern was that [Student] was falling behind in [his/her] classwork, because
> [s/he] was spending a lot of time at our clinic health center, and failing [his/her]
> classes.  I had been meeting repeatedly with [Student], initially from a referral
> from Marlys Martin.  [Student] claims that students mistreated [him/her] after
> school in [another state], and that [s/he] had tried to hurt [him/herself] several
> times afterwards (including jumping off a bridge). * * * I would be glad to meet
> with anyone in regards to [Student].

(Ex. S20 at 5.)

28.     On May 15, 2013, Ms. Cannon emailed Ms. Linder and others as follows:

Hi all and Cheryl

We will discuss this via our usual way at SST/Data Team.  Cheryl, we need to have our district consultant involved in these conversations.  This usually happened through SST/Data Team, before involving the Special Education team.  My concern at this point is that we do not have a district consultant working with us while Ty is out.  Can you help with getting us someone from the district to support us with this concern?

(Ex. S20 at 7.)

29.    Although school staff would have normally discussed the Parents' request for an IEP for Student at a SST meeting, the team failed to timely respond to the Parents' request and did not address Student's needs for supports or services in any of the remaining SST meetings during that school year. (Ex. D1 at 5.)  The school's special education consultant (Ty Zeller) remained out for an extended period of time, and staff neglected to schedule a pre-referral meeting.  (Tr. Vol. I at 84-85.)

30.    After the Parents were contacted by the truancy officer in March 2013, they changed the way they dealt with Student's absences.  Rather than reporting that Student was missing school due to an emotional meltdown, they began to report that student was physically ill and unable to attend class.  (Tr. Vol. IV at 130-32; Ex. D33 at 2; Ex. D30 at 3-4.)  For example, on April 22, 2013, Father reported that Student had a cold, with a sore throat and no voice.  (Ex. D30 at 4.)  On April 29 and 30, 2013, Father advised that Student was staying home "due to illness (sore throat)." (*Id.* at 3.)  And, on May 21, 2013, Father notified Student's teachers that Student's ongoing symptoms were "consistent with mononucleosis." (Ex. D33 at 2.)  Father asked that the teachers provide periodic updates on the subject matter covered in Student's classes. (*Id.*)

31.    The family did not have health care insurance during this time period and the Parents did not have the money to take Student in for evaluation or treatment. (Tr. Vol. IV at 133-34.)  The Parents advised the school that Student had symptoms consistent with mononucleosis because, in addition to feeling anxious, depressed and mentally unable to attend many classes at school, Student was complaining of fatigue and a sore throat.  (Tr. Vol. IV at 130-132.)

32.    For the 2012-2013 school year, Student received passing grades in two courses, US History and Japanese I and earned 1.125 credit hours.  (Ex. D36.)

33.    In August 2013, after the Parents obtained medical insurance, Student was seen by Angela Romanoski, M.D., at Eugene Pediatrics for a "well child check" to establish care. Records from the office visit document the following: "[Student] has a significant past medical history of likely autism spectrum disorder, depression, anxiety, and multiple episodes of attempted suicide." (Ex. S12 at 1.)  The records also state that Student had a "very hard first year" at the local high school and that Student had "mono this last year." (*Id.*)  In addition, Student reported having two siblings with autism, one high functioning and one moderately to

profoundly affected, and that the family has lived "a very mobile life, moving and living in a trailer for the last few years." (*Id.*)  Student was prescribed an increase in antidepressant medication to address his/her depression and another medical condition. (*Id.* at 4.)

34.    For the 2013-2014 school year, Student's local high school changed from a semester schedule to a trimester schedule.  In the fall trimester, Student enrolled in US History, four eleventh grade International High School (IHS) courses[3] and Japanese II.  (Ex. D36.)

35.    In October 2013, Student submitted an essay in English class in which s/he discussed his/her troubled emotional state.  Student wrote about being sexually assaulted by a group of students at school at the age of 13.  Student wrote about keeping the incident a secret from his/her parents, about the feelings of shame and anger, about his/her anxiety at school and about harming him/herself and attempting suicide.  (Ex. S7.)

36.    In early November 2013, the Parents emailed the school and requested an update on their requests for an IEP meeting for Student.  (Ex. S20 at 12.)  Although school staff had internal discussions regarding the approach to take with Student and the Parents, staff again failed to address this matter at any weekly SST meetings and failed to timely respond to the Parents' request for an IEP meeting.  (Ex. D1 at 5.)

37.    On December 5, 2013, the Parents filed a letter of complaint with the ODE alleging that the District violated the IDEA by failing to identify and evaluate Student for special education upon the Parents' request.  The ODE undertook a special education investigation pursuant to OAR 581-015-2030 and, on February 10, 2014, issued a Final Order in *In the Matter of Eugene School District,* Case No. 13-054-035.  The February 10, 2014 Final Order found that the District violated the Child Find provisions of the IDEA and failed to evaluate and determine whether the Student was eligible for special education services.  Specifically, in addition to finding a Child Find violation, the Final Order stated as follows:

> The Parents remitted two separate requests for evaluation and an IEP pursuant to OAR 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(2) after obtaining a diagnosis for Autism Spectrum Disorder (ASD) for the Student.  The District did not respond regarding whether the request for evaluation was denied nor did the District provide the Parents with Prior Written Notice (PWN) information on an evaluation, information on IDEA eligibility, or an evaluation consent form.  The District subsequently did not commence evaluation planning or complete an initial evaluation within 60 days of receiving written Parent consent.

(Ex. D1 at 2.)  The ODE did not, however, substantiate the Parents' allegation that the District denied Student a FAPE.  In this regard, the Final Order concluded:

---

[3] IHS is an alternative school program with a prescribed curriculum that focuses on global studies, history, economics and language arts.  The IHS curriculum is often tied to the international baccalaureate and advanced placement programs.  Eugene high school students who are enrolled in IHS generally take their IHS courses in a block in one half of the day and then take other core classes, such as math, physical education or health the other half of the day.  (Tr. Vol. I at 114.)

While the District clearly did not comply with the procedural components of the IDEA described above, there is inconclusive evidence in the record that these violations alone, rather than the lack of school or class attendance (derived from matters wholly unrelated to an IDEA eligible disability), have prevented the Student from receiving a FAPE.  Based upon the facts as presented, and lack of evidence clearly demonstrating Student's need for IDEA services, there is no conclusive basis to find that the District denied the Student a FAPE at this time. If there is a determination of eligibility, then this issue may be revisited within the parameters of the IDEA dispute resolution process.  This allegation is not substantiated.

(*Id.* at 10.)

38.     As Corrective Action for the substantiated allegations, the February 10, 2014 Final Order directed, among other things, that the District expedite Student's evaluation and eligibility determination with the Parents' informed written consent and complete that process by April 4, 2014.  (*Id.* at 10-11.)

39.     While the Parents' December 5, 2013 complaint was pending before the ODE, the District did not act on Parents' request for special education services for Student.  Notes from a December 16, 2013 SST meeting indicate that the team discussed the fact that Student was "currently involved with the state regarding eligibility," that the team was "missing a piece of documentation," and that "Cheryl [Linder] is handling the situation." (Ex. S16 at 1.)  Notes from the January 13, 2014 and January 27, 2014 meetings similarly document that the team was waiting to hear back from Ms. Linder regarding Student's status and the pending ODE complaint.  (Ex. S16 at 2-3.)

40.     Student did not pass any classes during the fall 2013 trimester.  (Ex. D36.)  For the winter 2014 trimester, Student enrolled in three IHS courses, a Ceramics class and a Spanish class.  (Tr. Vol. II at 259.)  Student's sibling S, who also attended the school, was enrolled in two classes with Student.  At that time, S had a one-to-one instructional aide to support and assist S in class.  One day in during January 2014, Student told S to sit with Student near the front of the class.  Student did so because s/he wanted S to have more social interaction and not be isolated from other students.  (Tr. Vol. II at 260.)  S's instructional aide advised Student that S needed to sit in the back of the classroom so that she could work with S and provide support without disrupting the other students in class.  This resulted in a confrontation in the classroom between Student and S's instructional aide.  (Tr. Vol. II at 260-61; Tr. Vol. IV at 88-90.)

41.     A day or so later, Student advised S's instructional aide that the aide was not going to be working with S any more.  On the Parents' request, a decision was made to replace this instructional aide.  (Tr. Vol. IV at 90-91.)  Shortly after this incident, Student dropped the Spanish class.  (Tr. Vol. II at 261.)

42.     After investigating the matter, the District recommended that Student and S no longer be placed in the same classes at school.  The District determined that having Student and S in class together interfered with both students' abilities to access their education.  In particular,

the District found that Student spent time in class being an advocate for S's needs and not tending to Student's own work, which was disruptive to both Student's and S's education. (Tr. Vol. I at 63-64.)

43.    Student again stopped attending school on a regular basis. In February 2014, the school referred Student's truancy matter to the District, who served the Parents with another nonattendance letter.   The Parents also received a nonattendance letter regarding Student's sibling S, who also had many unexcused absences from school at that point.  The letters, which were dated February 2, 2014, advised the Parents that their children were expected at school the following day.  The letter also explained that the failure to comply with the compulsory school attendance law is considered a Class C Violation and may result in the issuance of a citation filed with the Lane County Court. (Ex. D37.)

44.    On February 24, 2014, the Father advised the school that Student and S were off campus for the day for medical reasons. (Ex. S31 at 7.) Again on February 25, 2014, the Father notified the school that Student was out for medical reasons. (*Id.* at 6.)

45.    On March 12, 2014, in accordance with the ODE's February 10, 2014 Final Order, the District convened an Evaluation Planning/File Review meeting to discuss Student's evaluation for special education.  The meeting was attended by Mother; Special Education Consultant Heather Beard; Case Manager and School Psychologist Karen Apgar; ESS Administrator KC Clark and the Parents' Attorney Melissa Wischerath.  The team agreed to evaluate Student for autism and emotional disturbance and set a schedule for the evaluations and the eligibility determination. (Ex. D4.)

46.    In late March 2014, the District issued notices to the Parents summonsing them to truancy conferences at the school on Wednesday, April 2, 2014.[4] Sibling S's conference was set for 10:00 a.m. and Student's conference was for 10:30 a.m. (Ex. D37; Tr. Vol. II at 170-71.) The conference notification letter advised the Parents of their obligation to maintain their child in regular attendance for the remainder of the school year and/or enroll him or her at the local high school or another Oregon state approved educational setting by the next school day.  The notice also advised: "Failure to attend the conference will automatically result in a citation being issued to you.  Oregon Revised Statute 153.019 indicates that the presumptive fine is $160 per violation, as well as any appropriate court fees." (Ex. D37 at 11.)

47.    Due to scheduling conflicts and spring break, Student's special education evaluations were not completed in March, which necessitated postponing and rescheduling the

_____

[4] Previously, in late January 2014, the District had scheduled a follow up meeting with the Parents for 9:00 a.m. on April 2, 2014 to discuss matters related to special education services for Student's sibling S. When, in March 2014, Ms. Linder became aware of the District's need to schedule truancy conferences due to Student's and S's nonattendance, she suggested to the Truancy Hearings Officer that the conferences be scheduled beginning at 10:00 that same morning (April 2, 2014), so that the Parents did not have to make multiple trips to the school.  (Tr. Vol. II at 170-71.)   When Ms. Linder suggested this date and times for the truancy conferences she was not aware that Student's IEP team had, just days before, scheduled an eligibility meeting for Student at 11:00 a.m. on April 2, 2014.  (*Id.* at 180, 207-208.)

eligibility meeting that had been originally set for 11:00 a.m. on April 2, 2014. (Ex. D38; Tr. III at 162-66.)

48.     On March 31, 2014, Ms. Apgar emailed Mother to set up a time to complete Student's cognitive evaluation. Ms. Apgar advised that she was available any time before 1:00 a.m. on April 2. Mother responded to Ms. Apgar via email as follows:

> Karen, I was hoping to re-use that 11am slot we'd scheduled for [Student's] IEP – however, last week, the District served us with a demand to appear at SEHS with [Student] at 11am – strangely enough, the exact same time as the scheduled IEP meeting. Unfortunately, I now need to seek guidance from the State Department of Education as to how to continue with the IEP process in light of the District's actions, so I'm not sure if any time tomorrow will work. I will keep you informed if we can in fact meet tomorrow.

(Ex. D38 at 2.)

49.     Also on March 31, 2014, the Father went to school with Student and S to confirm their enrollment for the spring trimester. Father had previously requested that Student and S be scheduled in two classes together because the Parents believed Student would be more likely to go to school if s/he was in classes with S. Father was dismayed to learn that, based on the District's recommendation, Student and S had not been scheduled in any classes together. Later that day, the Parents decided to withdraw Student and S from school. (Tr. Vol. IV at 150-52.)

50.     The Parents did not attend the follow up meeting for S at 9:00 a.m. on April 2, 2014 or the truancy conferences scheduled for S and Student at 10:00 a.m. and 10:30 a.m. at the school.[5] The Parents chose not to attend the truancy conferences because they assumed the issue would be moot with Student and S withdrawn from school. (Tr. Vol. IV at 160-161.) Mother and Student did, however, go to the District office that morning so that Student could complete the assessments and evaluation with Ms. Apgar. Around 11:30 a.m. or noon on April 2, 2014, while Student was meeting with Ms. Apgar at the District office, Father went to the school to withdraw Student and S from school. (Id. at 152-53.)

51.     Because the Parents did not attend the truancy conferences, the District's Truancy Hearings Officer issued citations to the Parents for failing to maintain Student and S in regular attendance at school. The Truancy Hearings Officer was unaware that Student had an evaluation scheduled and unaware of the reasons why the Parents chose not to appear for the conferences. The citations directed the Parents to appear at the Lane County Circuit Court at 8:30 a.m. on April 24, 2014. (Ex. D37 at 2, 8-9.)

52.     Later that same day, Mr. Barr went to the Parents' home to serve the truancy citations on the Parents. (Ex. D37 at 8-9) Mr. Barr arrived at the Parents home and served the

---

[5] Ms. Linder went to the school on the morning of April 2, 2014 expecting to meet with the Parents at 9:00 a.m. regarding S's services and then at 10:00 a.m. to discuss S's and Student's absenteeism. Ms. Linder did not learn until after the fact that Student was also scheduled for an evaluation with Ms. Apgar at 11:00 a.m. that day. (Tr. Vol. II at 181-183.)

citations on the Parents around 1:45 p.m., just as the Parents were leaving to go pick up another one of their children from school.  (*Id*; Tr. Vol. IV at 153.)

53.    On or about April 3, 2014, the Parents signed Student and S up for home schooling for the remainder of the school year.  (Tr. Vol. IV at 156.)

54.    On April 15, 2014, Ms. Apgar completed her psychoeducational evaluation of Student.  She concluded that Student met the minimal criteria for both Emotional Disturbance and Autism Spectrum Disorder, that Student's behaviors indicative of autism were present from an early age and continued as Student grew older, and that Student's symptoms were mild in comparison to Student's siblings.  Ms. Apgar found that Student was intellectually gifted.  She also determined that Student's anxious, depressive and withdrawn behaviors were not present in early childhood, but became salient after Student was sexually assaulted were consistent with the diagnosis of PTSD.  Ms. Apgar concluded:

> In essence, it can be said that [Student's] Autism Spectrum Disorder
> characteristics are *developmental*, while [Student's] Emotional Disturbance
> characteristics are *acquired*.  While the Autism behaviors certainly impact
> [Student's] social interactions and functioning in the school setting, the Emotional
> Disturbance behaviors are currently having a larger impact on [Student's]
> education, as they are preventing [Student] from attending or staying in school.

(Ex. D12 at 13.)

55.    On April 18, 2014, the special education team met to determine Student's eligibility for special education.  Mother, Ms. Apgar, Ms. Beard and Ms. Clark attended the meeting.  The team determined that Student met the disability criteria in the areas of Autism Spectrum Disorder and Emotional Disturbance, that these conditions had an adverse impact on Student, and that Student was eligible and in need of special education.  (Ex. D9.)

56.    In May 2014, after the Parents' first scheduled court appearance, the District requested dismissal of circuit court truancy proceedings based on the Parents enrolling Student and S in an approved educational setting.  (Ex. D37.)

57.    On May 5, 2014, the special education team held an Initial IEP meeting for Student.  The following individuals attended the meeting: Mother; Ms. Apgar; Ms. Beard; Chris Stober, autism specialist; Kim Reinhardt, behavioral intervention specialist; and Melissa Wischerath, attorney for the Parents.  (Ex. D17.)  The team determined, among other things, that Student's Emotional Disturbance and ASD rendered Student unable to attend a general education classroom at that time.  The team agreed that Student needed SDI in the areas of transition services (60 hours per year), study/organizational skills (45 hours per year), mathematics (90 hours per year) and behavior/social skills (90 hours per year).  The team also determined that Student needed related services in the area of assistive technology, and various supplemental aids, services, modifications and accommodations.  In addition, the team determined that Student needed 5 hours per year with a behavior specialist consultant and 10 hours per year with an autism consultant.  The team further found that Student needed to be removed from participating

with nondisabled students in the regular classroom in order to receive SDI, related services and/or supplementary aids and services.  (Exs. D18 and S1.)

58.    Student's IEP team convened a second meeting on May 12, 2013 at which they discussed extended school year (ESY) services, classroom accommodations, supports and placement.  The team confirmed that Student needed to be removed from the general education setting for instruction in social skills, organization, transition and math.  The team discussed Student's need to be in a smaller school or an alternate education environment, such as a small private school located in the area.  As for ESY, the team determined that they did not have the regression/recoupment data to support ESY.  The District did, however, offer to provide 20 hours of individual or small group support to Student in Student's goal areas during the summer, from around July 1 through August 15, 2014.  During the meeting, Ms. Clark suggested a therapeutic school's day treatment program to help stabilize Student prior to the start of the 2014-2015 school year.  (Ex. S38 at 8-9; Tr. Vol. I at 49.)

59.    During the 2013-2014 school year, Student received a passing grade in two courses, US History and Ceramics, and earned .375 credits toward graduation.  (Ex. D36.)

60.    On June 9, 2014, members of Student's IEP team met to develop a behavior support plan (BSP) for Student.  The BSP included a variety of prevention and teaching components as well as reinforcement strategies and consequence strategies designed to help Student achieve the behavioral goals set out in the IEP.  (Ex. D22.)

61.    For 39 days in the summer of 2014, from June 23, 2014 to August 15, 2014, Student attended the therapeutic school.  While the therapeutic school's summer program did not include academic classes, Student received specialized services in the area of behavioral and social skills.  Student's treatment goals at the therapeutic school included developing adaptive coping skills to process distress, using positive social skills to develop positive peer and adult relationships, and developing increased self-management skills.  (Ex. D39; Tr. Vol III at 79-84.)

62.    Student made progress on his/her treatment goals during the summer quarter at the therapeutic school.  Student showed improving social skills in dealing with peers, which was significant considering Student's trauma history.  Student was able to use staff support to successfully process Student's emotions on numerous occasions, and showed a commitment to the process of individual therapy.  (Ex. D39; Tr. Vol. III at 85-91.)

63.    On August 29, 2014, Student's IEP team met again to review the IEP and make amendments or revisions in light of Student's progress at the therapeutic school and his/her planned transition to the private school.  Participants at this meeting included the Mother, Ms. Reinhardt, Ms. Clark, teachers and administrators from the private school, a therapist from the therapeutic school and others knowledgeable about Student's special education needs.  During the meeting, the team agreed to certain changes in Student's related services, including providing Student with an hour per week of mental health counseling for 36 weeks and an hour per week of social skills instruction with an autism specialist for 36 weeks.  The team also determined that Student required transportation services "due to the disability and access to the program site," but did not require ESY services.  (Ex. D24.)

64.    In September 2014, Student enrolled at the private school.  To date, Student has excelled academically at the private school and has made progress on goals pertaining to behavioral/social and study/organizational skills.  (Ex. D35; Tr. Vol. IV at 106-16.)

65.    On September 25, 2014, the Parents filed the due process complaint at issue.  On October 6, 2014, the District filed its response to the Parents' complaint.  In preparing the District's response, Ms. Linder gathered information from staff members at Student's local high school who were involved with Student's education over the previous two years.  Ms. Linder received information that Student had a 504 Plan in place to accommodate a medical condition.  Although Ms. Linder could find no documentation of such a plan, and later learned that Student did not have a 504 Plan while attending the local high school, the District's initial response to the due process complaint indicated that a 504 Plan had been written for Student in April 2013.  (Ex. S21 at 1; Tr. II at 201-204, 223.)

66.    In November 2014, the Parents filed a letter of complaint with the ODE regarding the implementation of Student's IEP.  Among other things, the Parents alleged that District had failed to provide SDI to Student in the areas of behavioral/social skills, transition services, and study/organizational skills, failed to provide transportation and failed to provide an assistive technology device. (Ex. S34.)

67.    On January 16, 2015, the ODE issued a Final Order in *In the Matter of Eugene SD 4J*, Case No. 14-054-042.  During the investigation, the District conceded that it had failed to provide SDI in the areas of behavioral/social skills and study/organizational skills as prescribed in the IEP.  The District also conceded that it had failed to provide required transportation services until October 13, 2014.  The ODE Final Order found that the other allegations, those pertaining to transition services and assistive technology, were not substantiated.  As Corrective Action for the substantiated allegations, the January 16, 2015 Final Order directed, among other things, that the District:

● provide training to the private alternative schools with which it contracts covering access to and implementation of IEPs;

● reimburse the Parents for the cost of transportation for school days from September 4, 2014 through October 12, 2014;

● reimburse the Parents for the cost of independent tutors in behavioral/social skills and student/organizational skills up to $800; and

● provide mental health counseling for Student as prescribed in the IEP, including paying for Student's mental health counseling for a three month period, four hours per month, to compensate for the counseling Student did not receive during September through December 2014.

(Ex. S34.)

68.     Since December 2014, Student has been receiving specialized tutoring in the areas of behavioral/social skills and study/organizational skills.  In terms of improving his/her behavioral/social skills, Student is currently working two hours per week with Monica Bounds, an autism specialist and licensed educator with endorsements in special education.  Ms. Bounds is providing training to Student on understanding and applying the unwritten rules for social communication, code switching and effective communication, and managing anxiety in social situations.  Student has been making good progress in these areas.  (Tr. Vol. IV at 106-20.)

69.     Student currently takes a school bus to the private school in the mornings.  The ride takes about 25 minutes.  Student uses alternate transportation for the trip home after school because, with the bus schedule, it takes about an hour and 15 minutes to get to Student's home. This interferes with Student's ability to take compensatory education courses or extra classes after school. (Tr. Vol. IV at 61.)

## CONCLUSIONS OF LAW

1.     Student's absences during 23 days in April and May of 2013 were a manifestation of Student's disability rather than the result of physical illness.  Student's formal academic records should be modified accordingly.

2.     As set out in more detail herein, the compensatory education necessary to remedy the denial of FAPE during the 2012-2013 and 2013-2014 school years includes providing Student with the opportunity to obtain all credits required to graduate and the provision of 414 hours of SDI in the service areas identified in Student's May 2014 IEP (transition services, study/organizational skills, mathematics, and behavior/social skills).

3.     The Parents have not established entitlement to the remedy of ongoing mental health services for Student.

## OPINION

The burden of proof in an administrative hearing alleging violations of the IDEA, 20 U.S.C § 1400 *et seq.*, is properly placed upon the party seeking relief.  *Schaffer v. Weast*, 546 U.S. 49 (2005).  In this matter, the Parents filed a due process complaint seeking certain determinations, compensatory education based on a denial of FAPE during the 2012-2013 and 2013-2014 school years, and provision of continuing mental health services to Student as a remedy for alleged harassment and retaliation by the District.   The burden rests on the Parents to prove the allegations and the extent of compensatory education and services they seek.

In administrative hearings, a party who bears the burden must establish each fact or position by a preponderance of the evidence.  ORS 183.450(2); *Harris v. SAIF*, 292 Or 683, 690 (1982) (general rule regarding allocation of burden of proof is that the burden is on the proponent of the fact or position); *Cook v. Employment Division*, 47 Or App 437 (1980) (in absence of legislation adopting a different standard, the standard in administrative hearings is preponderance of the evidence).  Proof by a preponderance of evidence means that the fact finder is convinced that the facts asserted are more likely true than false.  *Riley Hill General Contractor v. Tandy*

*Corp.*, 303 Or 390 (1987).

      1.     *Student's absences for 23 days in the spring of 2013.*

As set out above, the parties stipulated at the outset of the hearing that the majority of Student's absences were a manifestation of Student's disability.[6]  The District asserted, however, that Student's absences over 23 days in the spring of 2013 were due to physical illness and not Student's disability, and should therefore not be included in the compensatory education determination.

The record establishes that after the District sent the truancy officer to the family's home in late March 2013, the Parents changed the way they dealt with Student's absences from school. Rather than advising the school that Student was absent due to an emotional or mental illness, they began to report that Student was physically ill.  In April 2013, the Parents repeatedly attributed Student's absences to a cold and sore throat and, in mid-May 2013, to symptoms consistent with mononucleosis.

Despite what the Parents reported to school staff, a preponderance of the evidence establishes that Student's absences during this time period were not the result of a contagious disease, such as a head cold or mononucleosis.  Rather, the evidence demonstrates that Student was unable to attend class on a regular basis during this time because of his/her anxiety and depression, characteristics of Student's ASD and Emotional Disturbance.  For this reason, Student's formal academic records should be modified, in accordance with the parties' prehearing stipulation, to reflect zero absences for the 2012-2013 school year, along with the comment "absences related to disability are not recorded."

      2.     *Compensatory education as a remedy for the denial of FAPE.*

Compensatory education services can be awarded as appropriate equitable relief. 20 U.S.C. § 1415(i)(2)(C)(iii) (the court shall grant such relief as the court determines appropriate based on a preponderance of the evidence); "Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Puyallup Sch. Dist.*, 31 F3d 1489, 1496-97 (9th Cir.1994); *see also Park v. Anaheim Union School Dist.,* 464 F3d 1025 (9th Cir. 2006).  Appropriately educated within the meaning of the IDEA means that a school district must provide a basic floor of opportunity for disabled children; it does not require that the district maximize each child's potential.  *Board of Educ. v. Rowley,* 458 US 176 (1982).

Here, as detailed above, the District has conceded that it denied Student a FAPE during the 2012-2013 and 2013-2014 school years and that, as a result of the denial of FAPE, it is obligated to provide appropriate relief in the form of compensatory education and related

---

[6] Pursuant to 34 C.F.R. §300.530(e)(1), the conduct or behavior is considered a manifestation of the child's disability: "(i) If the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or  (ii) If the conduct in question was the direct result of the LEA's failure to implement the IEP."

services. The District also conceded that its Child Find duty with regard to Student was triggered as of September 10, 2012. As set out previously, the parties stipulated to the following as relief for the District's denial of FAPE to Student:

> ● With the exception of the disputed offsets (addressed below), the District will provide Student with two years' worth of SDI (570 hours) in the service areas identified in Student's May 2014 IEP (math, behavioral/social skills, study/organizational skills and transition training).[7]

> ● The District will provide Student the opportunity to take all coursework required for a standard high school diploma;

> ● The District will provide Student the opportunity to recover the 10.5 credits that Student did not complete during the 2012-2013 and 2013-2014 school years;

> ● If Student accesses online coursework as part of the delivery of compensatory services, the District will provide access to technology consistent with the process provided to all students.

As to the disputed offsets, the District contends that it should not be required to provide compensatory education for 23 days Student was absent from school due in the spring of 2013 reportedly due to a contagious disease and that it should receive an offset from the compensatory education award for the time Student attended the therapeutic school. The Parents dispute these offsets and seek an award of 570 hours of SDI in the service areas identified in Student's IEP. As for Student's time at the therapeutic school, the Parents maintain that it should be viewed strictly as services provided under the May 2014 IEP and not as compensatory education for the denial of FAPE during the 2012-2013 and 2013-2014 school years.

With regard to the 23 absence days in dispute, as discussed above, the evidence demonstrates that Student's absences were a manifestation of Student's disability and not due Student having a contagious disease. Had Student been subject to an IEP and receiving special education services during that time, s/he likely would have been present at school and able to receive such instruction. Therefore, specialized instruction hours for these 23 days should not be subtracted from the award of compensatory education hours.

However, as to Student's time at the therapeutic school, I find that the District is entitled to offset hours for the services and instruction Student received during the summer quarter of 2014. Despite the Parents' contention, the evidence fails to demonstrate that Student's attendance at the therapeutic school was supplemental to and/or required by Student's May 2014 IEP. That IEP did not require ESY services nor did it direct placement at the therapeutic school. Rather, the record establishes that, during the May 12, 2013 IEP meeting, the District offered to

---

[7] In their due process complaint, the Parents sought a specific number of hours for each service area (120 hours for transition skills, 90 hours for study skills/organization, 180 hours for math and 180 hours behavioral/social skills). The District took no position on how these compensatory SDI hours are to be allocated among the identified service areas, and the parties have stipulated that the Parents may make that determination. (Tr. Vol. III at 35, 125-26, and 168.)

provide additional services and support to stabilize Student before s/he began his/her placement at the private school in the fall. Ms. Clark suggested the therapeutic school as an option. After looking into the program, the Parents enrolled Student for the summer quarter. During Student's eight weeks at the school, Student received therapy and instruction in coping skills, social skills and self-management. As the District notes, the services provided went above and beyond what the District was legally obligated to provide to Student under the May 2014 IEP.

The fact that Student received counseling and instruction in service areas identified in Student's IEP at the therapeutic school and the fact that s/he made progress on his/her treatment goals during his/her stay weigh in favor of treating Student's time at the therapeutic school as compensatory education, rather than against it. Student attended the therapeutic school for four hours a day for 39 days, a total of 156 hours.[8] The District is entitled to offset those 156 hours against the 570 hours of SDI identified in the parties' stipulation. Consequently, as part of the compensatory education award, the District shall provide Student with 414 hours of SDI in the service areas identified in Student's 2014 IEP.[9]

Along with the credit recovery coursework and SDI discussed above, the Parents also seek the following as part of the remedy for the denial of FAPE: reimbursement for their transportation of Student during the prior two years; parental control over the nature and timing of the compensatory education coursework and the providers of Student's SDI; and provision of an aide to accompany Student should Student need it to access his/her compensatory education coursework.[10] For the reasons set out below, however, the Parents are not entitled to a determination in their favor on these additional remedies.

*Transportation Reimbursement.* Student's May 2014 IEP did not provide for transportation and did not determine a specific placement (other than determining that Student required removal from the regular general education classroom to receive SDI). Student's August 29, 2014 Amended IEP did provide for transportation to the special education program site.[11] Considering that Student's IEP team determined that Student requires transportation to and

---

[8] Although the District calculated Student's time at the therapeutic school to be 152 hours, 39 days at four hours per day totals 156 hours.

[9] As noted above, the parties have stipulated that the Parents could determine the allocation of hours among the four identified service areas. Logic dictates, however, that because Student's time at the therapeutic school focused on behavioral and social skills and not on math, study skills/organization and transition planning, the 156 hours should be offset from the 180 hours allocated to instruction in behavioral/social skills.

[10] In the due process complaint, the Parents also sought reimbursement for the "Parents' expenses for private classes in any extracurricular activity that would have been available to [Student]" and any school trips available to students during the 2012-2013 and 2013-2014 school years. The Parents did not, however, offer evidence at hearing of any costs incurred for private classes or extracurricular activity during that time frame, and did not argue this issue in their post-hearing brief.

[11] As found above, in the January 16, 2015 Final Order, ODE directed the District to reimburse the Parents for the cost of transportation to the private school for school days from September 4, 2014

from his/her placement at the private school, it follows that Student will also require transportation to access his/her compensatory education coursework, SDI and related services. But the transportation costs to access compensatory education are distinct from the Parents' request for reimbursement for their personal transportation costs for the days that Student attended the local high school during the 2012-2013 and 2013-2014 school years.

Reimbursement relief is different than compensatory education. Reimbursement is appropriate when the parents are forced to pay costs for unilateral placements or needed services in furtherance of a child's appropriate education. *See Burlington School Committee v. Department of Education,* 471 US 359 (1985) (reimbursement relief simply requires a district to pay expenses that it should have paid all along). But here, the record fails to show that the District should have been paying for Student's transport to the local high school, *i.e.,* that transportation to that school was a needed service.[12]

Parents argue that Student's current IEP provides for transportation "because the IEP team determined that Student was likely not capable of taking public transportation unassisted," but that assertion is not supported by the evidentiary record. Rather, as noted above, the Amended IEP indicates that Student requires transportation due to "the disability and access to the program site." The program site (the private school) is somewhere other than Student's local high school.[13] There are no notes from the IEP team's August 29, 2014 meeting in the record, and nothing in the Amended IEP itself suggests that Student's need for transportation is based solely on the nature of his/her disability, as opposed to the distance between Student's home and the private school. The fact that Student's autism consultant has concerns about Student's current ability to cope with unexpected problems should Student take public transportation is not sufficient to prove the District's liability for Student's transportation to and from Student's local high school during the preceding two school years.

Furthermore, even if the District should have been providing Student's transportation to and from the local high school, there is insufficient evidence in the record to determine an amount due the Parents as reimbursement. The Parents bear the burden of proving their out of pocket costs, *i.e.,* the number of days they drove Student to and from school during the two years in which Student was denied a FAPE and the cost of that transportation. While the record contains evidence that, during the 2012-2013 school year, Student was present at school 78 of 171 days, there is no evidence affirmatively establishing how Student got to school on those 78 days.[14] For the 2013-2014 school year, the record contains no evidence establishing the number

---

through October 12, 2014 (the day before the District began providing transportation for Student). The District acknowledged its liability for these expenses at the outset of this hearing.

[12] The evidence establishes that high school students who live in the Parents' neighborhood are not served by the District school busses and are expected to take public transportation (Lane Transit District) to the local high school. (Tr. Vol. IV at 52-53.)

[13] The Amended IEP obligates the District to provide transportation service to and from school for 40 minutes per day from August 30, 2014 to May 5, 2015. (Ex. D24 at 9.)

[14] Mother testified that Student has "never ridden a bus alone." (Tr. Vol. IV at 62) Presumably, Mother was referring to Student not taking public transportation by him/herself, as Mother also testified that

of days Student was present at school and/or how Student got there on those days.[15] Consequently, the Parents' claim for transportation reimbursement must be denied.

*Parental Control.* The Parents also assert that they, as opposed to the District or Student's IEP team, should have at the ultimate say over the nature and timing of Student's compensatory education coursework. In this context, citing *Reid v. Dist. of Columbia,* 401 F3d 516 (D.C.Cir. 2005) and *Board of Education of Fayette County, Ky. v. L.M.,* 478 F3d 307 (6th Cir. 2007), the Parents contend that the ALJ may not delegate her authority in crafting the compensatory education award to the IEP team or the District.

In *Reid,* a hearing officer awarded a student 810 hours of compensatory education to remedy a district's denial of FAPE for four and a half years. The hearing officer also vested the student's IEP team with the power to reduce or discontinue compensatory services if and when the IEP team determined that the student no longer needed or was benefitting from the compensatory education. On appeal, the District of Columbia Circuit reversed the hearing officer's award, holding that under the IDEA, hearing officers may not authorize IEP teams to reduce or discontinue awards of compensatory education. 401 F3d at 526.

Similarly, in *L.M.,* a hearing officer found that the child was denied a FAPE for his third and fourth grade years and, as a remedy for the denial, awarded a compensatory education package that included 125 hours of one-on-one instruction in reading and language skills. An appeals board affirmed the hearing officer's finding as to the denial of FAPE but reversed the award of 125 hours compensatory education in favor of a more fluid determination of appropriate compensatory education to be prepared by the child's IEP team. The appeals board ordered the IEP team to prepare and carry out a compensatory education plan and to meet at least every 12 months to review and modify the plan as needed until such time as the IEP team determines that the award is fulfilled. On appeal, the Sixth Circuit, relying on *Reid*, held that the appeals board erred in delegating to the child's IEP team the power to reduce or terminate a compensatory education award. 478 F3d at 317-18.

Despite the Parents' contention, neither *Reid* nor *L.M.* hold that it is appropriate for the ALJ to award the Parents or Student ultimate control over the nature and scheduling of Student's compensatory education coursework in this case. Indeed, just as it is improper for an ALJ to delegate to an IEP team the power to reduce or terminate an award of compensatory education, it is also improper for an ALJ to vest ultimate authority with the Parents or Student in the implementation of the compensatory education plan. *See, e.g., Forest Grove School District v. Student,* 63 IDELR 163 (D Or June 9, 2014), where the court found that it was inappropriate for an ALJ to order treatment services (counseling for anxiety) until the student was 21 or until "the

---

Student takes a school bus to the private school in the mornings. (Tr. Vol. IV at 61.) Regardless, testimony that Student has never ridden a bus alone does not prove the amount of transportation costs incurred by the Parents for the days Student was present at school during the two school years in issue.

[15] Additionally, during the 2013-2014 school year, Student's sibling also attended the local high school as a placement on an IEP. Presumably, on many occasions, Student and the sibling were transported to school together. As the District notes, the Parents have not provided evidence as to whether they received reimbursement for transporting Student's sibling to school during that year.

parties mutually determine that counseling . . . is no longer needed." In vacating this aspect of the ALJ's remedies award, the district court judge noted that by requiring such treatment until the student reached a certain age or until the parties mutually agreed to terminate the services vested "too much authority with the Parents in creating the educational plan." *Id.*

In short, in this case, the Parents are not entitled to sole discretion in the implementation of Student's compensatory education award. While this order sets the parameters for Student's compensatory education plan, the implementation of that plan is a matter best left to Student's IEP team.[16]

*One-on-one Instructional Aide.* The Parents have also requested an aide, should Student need one to access his/her compensatory education classes. The evidence fails to establish the need for a one-on-one aide in Student's current placement, and I am not persuaded that Student requires this special service to access his/her compensatory education coursework or SDI. Although there is evidence indicating that Student, when faced with unfamiliar locations or a more challenging social situation than what s/he faces at the private school, may need additional support in the form an aide accompanying him/her to class, this does not prove Student currently requires an one-on-one aide. Also, for the reasons discussed above, it is not appropriate to craft a compensatory education plan that gives the Parents discretion over whether and when Student should have a one-on-one aide to accompany him/her. Again, the determination as to whether, in the future, Student requires adult assistance or an instructional aide to accompany him/her to a particular class or location is one that is best left to Student's IEP team.

    3.    *Mental health services to Student as a remedy for alleged retaliation by the District.*

In their due process complaint, the Parents asserted that the District "harassed and retaliated" against Student and Parents in response to the Parents' filing of the December 2013 Complaint with the ODE in violation of OAR 581-015-2030(19).[17] The Parents also asserted that the District retaliated against them for their "ongoing advocacy for the civil rights of their disabled child protected under Section 504 of the Rehabilitation Act of 1973."[18] The Parents

---

[16] Obviously, as members of Student's IEP team, the Parents are entitled to meaningfully participate in the implementation of Student's compensatory education plan.

[17] OAR 581-015-2030(19) provides as follows: "No person may be subject to retaliation or discrimination for having filed or participated in this complaint procedure. Any person who believes that she or he has been subject to retaliation or discrimination may file a complaint under this rule with the Superintendent."

[18] 29 U.S.C. § 794(a) provides, in pertinent part, as follows:

No otherwise qualified individual with a disability in the United States, as defined in section 705 (20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

sought as a remedy for this alleged retaliation "mental health services necessary to allow [Student] to reasonably and safely access [his/her] IEP and placement at the [private school]." (Due Process complaint at 6-7.)

The District contends that to the extent the Parents' retaliation claim is premised on a violation of Section 504, the claim falls outside the jurisdiction of this IDEA proceeding. (District's brief at 5-6.)  The District notes, correctly, that this hearing is under the authority and jurisdiction of the IDEA.[19]  This is not Section 504 action.[20]  In response to this jurisdictional challenge, the Parents maintain that the relief they are seeking – counseling services for Student – is a remedy available under the IDEA.  They assert, therefore, that they must exhaust their administrative remedies in this forum before commencing suit under other provisions such as Section 504.  The Parents also assert that their retaliation claims are the "functional equivalent of a procedural defect claim under the IDEA" and therefore fall under IDEA jurisdiction.  (Parents' Response brief at 3.)

While the remedy the Parents seek is one that falls within the IDEA,[21] it does not appear that that their stated cause of action – retaliation under Section 504 and/or OAR 581-015-2030(19) – also falls under the IDEA.  Indeed, in *Payne v. Peninsula School Dist.*, 653 F3d 863 (9th Cir. 2011), a case cited by the Parents, the court questioned whether the IDEA is the appropriate law for obtaining relief designed to correct the effects of a school's intentional misconduct.  The court did not resolve the issue, but noted that: "it is far from clear that the IDEA authorizes the provision of services designed to correct injuries caused by the school's past violation of other laws."  653 F3d at 880.  Here, in briefing the issue, the Parents have not persuaded me that this IDEA proceeding is the proper forum in which to determine whether the District retaliated against Student and/or the Parents on the basis of Student's disability in violation of Section 504.  Although the Parents rely on the protections of Section 504 as a basis for their claim for compensatory counseling services for Student, that statute and its enforcement scheme fall outside the purview of this IDEA proceeding.

Consequently, at issue in this case is whether, *under the IDEA*, the District should be required to provide additional mental health services as part of Student's compensatory education plan.  For the reasons that follow, the answer is no.  The Parents have alleged that the

---

[19] The November 10, 2014 Notice of Hearing states: "[t]he authority and jurisdiction for the hearing are provided by the Individuals with Disabilities Education Improvement Act of 2004, 20 USC §1415 and by ORS 343.165 and OAR 581-015-2345 through 581-015-2395 and 581-015-2445."

[20] The IDEA focuses on the provision of appropriate public education to disabled children, whereas Section 504 more broadly addresses the provision of state services to disabled individuals.  *See Mark H. v. Lemahieu*, 513 F3d 922, 928-29 (9th Cir. 2008).  The remedies available under IDEA are limited and do not include compensatory damages.  *Id.* at 929.  The remedies available under Rehabilitation Act § 504 are broader and include compensatory damages.  *Id.* at 930.

[21] *See* 20 U.S.C. §1401 (26)(A):  The definition of "related services" includes "psychological services" and "social work services * * * designed to enable a child with a disability to receive a free appropriate public education."

District took adverse actions and that those actions aggravated and compounded Student's mental health condition, but the record simply fails to show any measurable harm to Student caused by the District's allegedly retaliatory conduct.  For example, when Student's counselor at the therapeutic school, Etan Milner, was asked at hearing whether Student needed counseling because of the District's alleged retaliatory actions (as opposed to the prior sexual assault and/or being bullied at his/her prior school), he responded, "I just don't have enough information.  I don't know." Tr. Vol. III at 220.  *See also* Tr. Vol. III at 212-13.  Also, the record is devoid of evidence showing that Student requires additional mental health counseling (beyond those 36 hours provided for in Student's August 29, 2014 Amended IEP) to access his/her educational plan.  Therefore, the District is not required to provide any additional compensatory mental health counseling.

Furthermore, even if the Parents' Section 504 retaliation claim was properly before me, they have not proven the claim on the merits.  The record does not support the Parents' contention that the District engaged in retaliatory conduct as a result of their filing of the December 2013 complaint with ODE and/or their ongoing advocacy on behalf of Student.

In their closing brief, the Parents point to three specific instances in which the District allegedly engaged in retaliatory behavior: (1) by denying the Student an evaluation for eligibility under the IDEA; (2) by citing the Parents for Student's truancy after Student had withdrawn from school; and (3) by falsely claiming that Student was on a 504 Plan.  (Parents' Post Hearing Memorandum at 27-28.)  However, these circumstances do not entitle the Parents to the relief they seek under the IDEA.

In the context of a Section 504 retaliation claim, a plaintiff must show that the school district acted "intentionally or with deliberate indifference." *Mark H. v. Lemahieu,* 513 F3d 922, 938 (9th Cir. 2008); *Duvall v. County of Kitsap,* 260 F3d 1124, 1139 (9th Cir 2001).  Deliberate indifference requires both knowledge that harm to a federally protected rights is substantially likely, and failure to act upon that likelihood.  *City of Canton v. Harris,* 489 US 378, 389 (1988) (deliberate indifference requires some form of notice and the opportunity to conform to statutory dictates).  Simply establishing a denial of FAPE under the IDEA is not sufficient to prevail in a Section 504 claim.  *Mark H. v Hamamoto,* 620 F3d 1090, 1096 (9th Cir. 2010); *see also Sellers v. School Board,* 141 F3d 524, 529 (4th Cir. 1998) (something more than a mere failure to provide a FAPE must be shown, either bad faith or gross misjudgment must be shown to support a Section 504 claim).

*Delay in Evaluating Student.*  As noted above, the Parents assert that after they filed the complaint with ODE in December 2013, the District retaliated against Student by waiting until after ODE issued its Final Order two months later (in February 2014) to evaluate Student for special education eligibility.  The Parents' argument assumes that District personnel knew, as of December 2013, that Student was in need of special education services and nevertheless refused to schedule evaluations and/or eligibility meetings, but this assumption is not borne out by the evidence.  While, in hindsight, the District should have responded to the Parents' requests for special education services, should have provided proper notice, and should have scheduled evaluations for Student during the prior school year, the District's inaction while awaiting the ODE determination (while constituting a denial of FAPE) does not amount to bad faith, gross

misjudgment or deliberate indifference.

*2014 Truancy Action.*  Parents next assert that the District retaliated against them by filing truancy charges after they failed to attend the truancy conference scheduled for the morning of April 2, 2014 and after Student was dropped from enrollment.[22]  Once again, the Parents' allegations of retaliatory conduct on the part of the District are not borne out by the evidence.

When, in March 2014, Ms. Linder recommended the April 2, 2014 conference date to the Truancy Hearings Officer, she was unaware that Student's IEP team had scheduled a meeting for 11:00 a.m. that day.  After the Parents received notice of the truancy conferences, Mother advised Ms. Apgar of the potential conflict, but did not notify the Truancy Hearings Officer or school administration that Student was scheduled for an evaluation with Ms. Apgar at 11:00 a.m. at the District office.  Upon the Parents' failure to attend the April 2, 2014 truancy conferences, and in accordance with the admonition in the conference notice, the Truancy Hearings Officer issued citations to the Parents for failing to maintain Student and sibling S in regular attendance at school.[23]  There is no evidence that the Truancy Hearings Officer was aware that Student had an evaluation scheduled for 11:00 a.m. and no evidence he was aware of the Parents' plans to withdraw Student school when he issued the citations to the Parents. There is also no evidence that the Truancy Hearings Officer knew that the Parents had filed a complaint with ODE.  Thus, no causal link has been shown between the truancy citation and Parents' filing of the ODE complaint.

It may have been negligent for the District to schedule the truancy conferences on the same day as a previously scheduled IEP team meeting, but the apparent lack of communication between District personnel the does not establish retaliation.  Similarly, the Truancy Hearing Officer's decision to issue citations to the Parents following their failure to attend the conferences was not, under the circumstances known at that time, prompted in any way by the Parents engaging in activity protected under Section 504.

*Lack of a 504 Plan.*  Finally, the Parents assert that the District retaliated by failing to evaluate Student and develop a 504 Plan and, later, by misrepresenting the existence of such a plan.  Again, despite the Parents' argument, the record fails to establish adverse action and/or a causal connection to protected activity under Section 504.

As found above, in early 2013, the Father contacted the school about obtaining a 504

---

[22] Although the school records reflect that Student was dropped from enrollment on Monday, March 31, 2014 (the first day of the spring trimester), testimony at hearing indicates that the Father withdrew Student and S from school late in the morning of Wednesday, April 2, 2014.

[23] Pursuant to ORS 339.010, all children between the ages of 7 and 18 years of age who have not completed the 12th grade are required to regularly attend school during the school term.  Pursuant to ORS 339.020, parents are required to maintain their children in regular attendance at school, unless the child is subject to an exemption from compulsory school attendance set out in ORS 339.030.  When a school district attendance supervisor is notified of a student's truancy or nonattendance at school, the attendance supervisor has a statutory obligation to notify the student's parent or guardian of the student's nonattendance.  ORS 339.055, ORS 339.080.

Plan for Student.  The Parents wanted an accommodation for Student's peanut allergy and accommodations pertaining to the curriculum in Student's Honors English class.  On March 22, 2013, Father met with Assistant Principal Cannon and School Counselor Larson to discuss accommodations for Student.  During the meeting, Father asked that Student be excused from attending or participating in class.  School staff advised Father that Section 504 plans generally address classroom accommodations, not home schooling, and may not be appropriate for Student.  Father left the meeting early and no plan was developed for Student.

Subsequent to this March 22, 2013 meeting, there was confusion and misunderstanding, primarily among persons who were not familiar with Student and not involved in the March 22, 2014 meeting, as to whether Student had a Section 504 Plan in place.  In an email among school staff members in May 2013 (after the Parents requested special education services for Student), Ms. Gourgey wrote, incorrectly, that Student was on a 504 Plan.  Ms. Cannon responded to this email by noting that when the school tried to hold a 504 meeting, the "Parent had issues * * * and walked out."  Nevertheless, the misunderstanding persisted.  In the fall of 2014, while preparing the District's initial response to the Parents' due process complaint, Ms. Linder received incorrect information from school staff that Student had a 504 Plan to accommodate a medical condition.

As the District conceded at the outset of the hearing, its failure to evaluate Student for eligibility for special education during the 2012-2013 school year constitutes a denial of FAPE.  But, the District's response to the Parents' request for a 504 Plan for Student does not constitute retaliation.  Similarly, the subsequent misunderstanding among staff members unfamiliar with Student as to whether Student had a 504 Plan does not amount retaliation.  While the evidence establishes communication breakdowns and misunderstandings, it does not demonstrate bad faith or gross misjudgment by the District.

Accordingly, for the above stated reasons, the Parents' claim for mental health services for Student as a remedy for alleged retaliation is denied.[24]

## ORDER

The parties have stipulated that the District did not provide Student with a FAPE during the 2012-2013 and 2013-2014 school years as required under the IDEA.  Accordingly, to remedy the denial of FAPE, it is ordered as follows:

● Before Student reaches 21 years of age (in September 2017), the District will provide Student with the opportunity to take all of the classes or credits Student needs to obtain a standard high school diploma under OAR 581-022-

---

[24] As discussed above, Student's August 29, 2014 Amended IEP provides for 36 hours of counseling with a mental health therapist during the 2014-2015 school year. (Ex. 24 at 9.)  Pursuant to the January 16, 2015 ODE Final Order, the District must pay for Student's mental health counseling for a three month period, four hours per month, to compensate for counseling Student did not receive during the first three months of the 2014-2015 school year. (Ex. S34.)  The District represented at hearing that it is committed to providing mental health counseling services to Student for the remainder of the current academic year regardless of the determination on the retaliation/harassment claim.

1131.  This includes the opportunity to recover the 10.5 credit hours towards a high school diploma that Student did not complete during the two school years in which Student was denied a FAPE.

●      Within three weeks of the date of this Order, the District will begin providing to Student, as compensatory education, 414 hours of specially designed instruction (SDI) in the following areas:  (a) transition services; (b) study/ organizational skills; (c) mathematics; and (d) behavioral/social skills.  The Parents may determine the allocation of hours among these four service areas.  At least 207 hours of SDI must be provided by September 2016; the remaining hours must be provided no later than September 2017, when Student reaches 21 years of age.

●      Student's compensatory education shall be delivered by a special education professional licensed by the Teacher Standards and Practices Commission (TSPC).

●      If Student accesses online coursework as part of Student's compensatory education plan and/or as part of the delivery of SDI, the District will provide access to technology consistent with the process provided to all District students.

●      The District will provide textbooks and software required for Student's credit recovery coursework and/or SDI.

●      The District will provide transportation to Student to and from the program site(s) for Student's credit recovery coursework and/or SDI.


Alison Greene Webster
Senior Administrative Law Judge
Office of Administrative Hearings


## APPEAL PROCEDURE

**NOTICE TO ALL PARTIES**: If you are dissatisfied with this Order you may, within 90 days after the mailing date on this Order, commence a nonjury civil action in any state court of competent jurisdiction, ORS 343.175, or in the United States District Court, 20 U.S.C. § 1415(i)(2).  Failure to request review within the time allowed will result in **LOSS OF YOUR RIGHT TO APPEAL FROM THIS ORDER.**

**ENTERED** at Salem, Oregon this 20th of March, 2015 with copies mailed to:

Jan Burgoyne, Oregon Department of Education, Public Services Building, 255 Capitol Street NE, Salem, OR 97310-0203.