BEFORE THE OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF OREGON
for the
SUPERINTENDENT OF PUBLIC INSTRUCTION

| | | |
|---|---|---|
| IN THE MATTER OF THE EDUCATION OF | ) | **FINAL ORDER** |
| | ) | |
| Student and Eugene School District | ) | Case No.: DP 15-113 |
| | ) | |

## HISTORY OF THE CASE

On August 31, 2015, Melissa Wischerath, counsel for Parents and Student, filed a due process complaint against the Eugene School District (the District) alleging violations of the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. §1415 (the IDEA) and the IDEA's implementing provisions in Oregon Revised Statutes (ORS) Chapter 343 and Oregon Administrative Rules (OARs) 581-015-2000 through 581-015-2930. The parties held a resolution session on September 14, 2015, but did not reach an agreement. The resolution period ended on September 29, 2015.

The case was referred to the Office of Administrative Hearings (OAH) and assigned to Administrative Law Judge ALJ Bernadette H. Bignon (ALJ Bignon). On October 5, 2015, ALJ Bignon held a telephone prehearing conference with Ms. Wischerath, Mother of Student, and Joel Hungerford, counsel for the District. At that conference, the District did not oppose Parents' request to extend the 45-day deadline to a date certain. ALJ Bignon granted the request.

A due process hearing was scheduled for January 12-15, 2016. ALJ Bignon issued a Notice of Hearing & Rights, providing deadlines of January 6, 2016 for the parties to submit witness lists and exhibits, January 9, 2016 for the parties to submit prehearing memoranda, February 12, 2016 for the parties to submit written closing arguments, and March 11, 2016 for ALJ Bignon to issue a Final Order. After the Notice of Hearing & Rights was issued, the OAH reassigned the case to ALJ Denise M. McGorrin (ALJ McGorrin).

On November 17, 2015, Parents filed a Motion for Summary Determination    The District submitted its response to the Motion on December 18, 2015. ALJ McGorrin denied the motion on January 14, 2016.

On December 23, 2015, Parents filed a Motion for Leave to File a First Amended Due Process Complaint.[1] The District timely submitted its response to the motion on December 30, 2015. ALJ McGorrin granted Parents' motion; the amendments were effective on January 6, 2016. As a result, timelines in the case, including the resolution period and the 45-day period to hold a hearing and issue an order, were reset.

---

[1] In this Final Order, Parents' original and amended complaints are referred to jointly as the due process complaints.

On January 11, 2016, ALJ McGorrin conducted a prehearing conference by telephone with Ms. Wischerath representing Parents and Student, and Nancy Hungerford representing the District.  At that conference, the parties indicated that they were scheduling a resolution session.  Because of the possibility that the case might resolve at the resolution session, Ms. Wischerath requested that the 45-day deadline be extended to a date certain.  The District did not oppose Parents' request.  ALJ McGorrin granted Parents' request, and advised that the Final Order would be issued on or before May 11, 2016.  On January 15, 2016, ALJ McGorrin issued an Amended Notice of Hearing & Rights, providing deadlines of February 29, 2016 for discovery to be completed and motions related to discovery to be filed, and providing deadlines of February 22, 2016 for the parties to submit witness lists and exhibits, February 29, 2016 for the parties to submit prehearing memoranda, April 11, 2016 for the parties to submit written closing arguments, and May 11, 2016 for ALJ McGorrin to issue a Final Order.

On February 25, 2016, Ms. Wischerath filed a motion to compel discovery.  ALJ McGorrin held a prehearing conference on February 29, 2016 to discuss the motion.  At the conference, ALJ McGorrin requested that the parties attempt to resolve the dispute raised in the motion.  On March 2, 2016, Ms. Wischerath advised ALJ McGorrin that the dispute had been resolved, and that Ms. Wischerath was withdrawing the motion to compel discovery.

On February 29, 2016, the District filed a prehearing brief.  On March 7, 2016, Student submitted a prehearing brief.

The hearing was held March 7-10, 2016.  As agreed by the parties, the hearing was held at the District's office at 200 N. Monroe Street in Eugene, Oregon.  The District provided a court reporter for the hearing, Naegeli Reporting, which prepared written transcripts of the hearing sessions. At Student's request, the hearing was closed to the public.

Before evidence was presented, Ms. Hungerford asked for clarification regarding Student's allegation in the Amended Complaint that goals agreed to in individualized education plan (IEP) meetings were not included in Student's IEPs.  Ms. Wischerath clarified that the goals related to transitions, communications, and perspective-taking for Student's 2015-2016 school year.

The District presented its case first.  The District presented testimony by AHS teachers, Lisette Ewing, Paul Schroder, and Chanci Herer-Tjerlund.   The District also offered the testimony of Kim Reinhardt, a District Behavior Consultant, Christopher Stober, a District Autism Consultant, K.C. Clark, the District's Special Education Administrator, and Heather Beard, a District Special Education consultant.   Student presented testimony of Jennifer Montgomery, a District Special Education consultant, Barbara Keyworth, a District School Psychologist, Cheryl Linder, the District's Director of Student Services, Monica Bounds, Director of Asberger's Support Network, Student's Mother, Student, and Kimberly Sherman, Ph.D, an outside consultant who has worked with Student.  On rebuttal, the District recalled Cheryl Linder, Heather Beard and K.C. Clark to testify.

The record was left open to allow for the receipt of the final hearing transcript and closing arguments. Naegeli Reporting released the hearing transcript on March 22, 2016. The parties submitted post-hearing briefs on April 11, 2016.

## ISSUES

Whether the District failed to provide a Free Appropriate Public Education (FAPE), based on the following alleged violations of the IDEA, its implementing federal regulations, and applicable provisions of Oregon law by:

1. Materially failing to implement Student's August 29, 2014 IEP by not providing: (a) specially designed instruction (SDI) in transitional, organizational and study skills, and social and behavioral skills; (b) counseling, a related service; and (c) progress reports to Parents.

2. Failing to create or provide Parents prior written notice of the location of Student's 2014-2015 school year educational services, thereby causing educational harm to Student.

3. Failing to timely provide Parents with Student's August 29, 2014 IEP for the 2014-2015 school year, thereby depriving Parents of their right to participate in the formulation of Student's IEPs.

4. Failing to timely provide Parents with Student's May 4, 2015 and November 12, 2015 IEPs for the 2015-2016 school year, thereby depriving Parents of their right to participate in the formulation of Student's IEPs.

5. Failing to timely provide to the IEP team Student's May 5, 2014 IEP for the 2014-2015 school year, thereby causing educational harm to Student.

6. Failing to timely provide to the IEP team Student's May 4, 2015 and November 12, 2015 IEPs for the 2015-2016 school year, thereby causing educational harm to Student.

7. Failing to use appropriate transitional assessments in developing Student's IEPs for the 2015-2016 school year, and failing to provide adequate transitional services for that school year, thereby causing educational harm to Student.

8. Failing to include in Student's IEPs for the 2015-2016 school year goals agreed-upon by the IEP team, thereby causing educational harm to Student.[2]

---

[2] For clarity of analysis, the issues listed in the Amended Notice of Hearings & Rights have been reorganized and restated. However, all issues raised by Parents in the original and amended due process complaints are analyzed in this Final Order.

## EVIDENTIARY RULINGS

The District offered exhibits D1, D2, D5 through D8, D10 through D17, and D20 through D29. Ms. Wischerath did not object to the exhibits, which were admitted into the record.

Ms. Wischerath offered Exhibits S1 through S45. The District did not object to S1 through 9, S12 through S14, and S16 through S45, and they were admitted into the record. The District objected to exhibits S10, S11, and S15 on relevance grounds. ALJ McGorrin ruled that the exhibits were relevant to issues raised in Student's due process complaint, and admitted exhibits S10, S11 and S15 into the record.

Parents offered Monica Bounds as an expert in social skills of students with autism and emotional disturbance disabilities. The District objected to Ms. Bounds on the ground that she was not qualified to testify as an expert. However, Ms. Bounds has worked extensively with Student since December 2014, providing counseling as well as behavior and social skills support. Additionally, Ms. Bounds has a bachelor's degree and psychology, as well as a master's degree in education. She testified about areas relevant to the case. Her testimony also was reliable and helpful to the trier of fact. The District's objections to Ms. Bounds' expert testimony therefore were overruled.

The objections were overruled because Ms. Bounds has significant experience working with disabled students on social skills. She has bachelor's degrees in social work and psychology, and a master's degree in education. Moreover, Ms. Bounds has worked extensively with Student since December 2014, providing counseling as well as behavior and social skills support. As a result, Ms. Bounds' testimony is relevant to the issues and, given her experience with Student, is reliable.

Parents offered Kim Sherman Ph.D to testify about transitional assessments in IEPs. The District objected on the grounds that transitional assessments were not raised by Parents in their original or amended due process complaints, and that Dr. Sherman had not taught high school, where transition services are required.

The objections were overruled because Parents did raise transitional assessments as an issue in their original and amended complaints.[3] Accordingly, that issue appears in the Amended Notice of Hearing & Rights issued by ALJ McGorrin to the parties before the hearing.

Dr. Sherman qualifies as an expert on transitional issues. She has a bachelor's degree in speech and communications, a master's degree in education, and a Ph.D in special education. Dr. Sherman has significant experience working with and teaching the transitions components of IEPs. Dr. Sherman also has worked with Student directly as a consultant on executive functioning and organizational skills.

---

[3] Parents raised the issue in their original complaint at page 3: [T]he District failed to use appropriate and adequate transitional assessments, and failed to provide appropriate and adequate transitional services to the Student during the 2014-2015 school year." The same claim appears in Parents' amended complaint at pages 6-7.

The District objected to Parents' evidence regarding the District's decision to place Student at an alternative high school on the ground that Parents did not raise that issue in their due process complaints. ALJ McGorrin sustained that objection because the issue was not in the complaints. Instead, Parents challenged the District's failure to provide prior written notice of the placement.[4] ALJ McGorrin held that the hearing was limited to issues asserted in Parents' due process complaints, as provided by OAR 581-015-2360(2), which provides in relevant part:

> Subject matter of hearing: The party requesting the due process hearing may not raise issues at the due process hearing that were not raised in the hearing request unless the other party agrees otherwise.

Thus, ALJ McGorrin held that Parents could not offer evidence challenging the decision to place Student at an alternative high school because Parents did not assert the placement decision as an issue in their due process complaints. Instead, Parents only asserted that the District failed to provide prior written notice of the placement decision.[5]

## FINAL ORDER CONVENTIONS

To protect Student's identity, no female or male pronouns will be used when referring to Student in this Final Order. Student's Parents will be referred to jointly as Parents, and singularly as Mother or Father. Testimony from the due process hearing will be cited to as (Test. of [Witness]; transcript at [page]. Exhibits will be cited as (Ex. [S for Student; D for District] number at [page].

## FINDINGS OF FACT

### Background

(1) At age 13, while living in New York with his/her family, Student was raped by three men in a school bathroom. As a result of that traumatic event, Student attempted suicide, and was hospitalized. While in the hospital, a psychiatrist diagnosed Student with autism spectrum disorder (ASD). (Test. of Mother; tr. at 1087.)

(2) Student's family moved to Eugene, Oregon in September 2012. Initially, Student attended one of the District's high schools. Because of emotional issues, Student had difficulty showing up for and staying in class. As a result, the District provided him/her one-on-one instruction at a District facility. To bridge Student back to a general education setting, the District placed him/her at a year-round private therapeutic school (PTS) for thirty-nine days during the summer of 2014. (Test. of Mother; tr. at 1104-1105.) The District completed a written placement form that reflected the PTS location. (Ex. S5.)

---

[4] Parents' amended complaint at pages 9-10.
[5] Parents' amended complaint at page 9.

## Student's Eligibility For Special Education

(3)    Student is extremely bright, creative, and a gifted student.  (Test. of Mother; tr. at 1148; Test. of Herer-Tjernlund; tr. at 528; Test. of Bounds; tr. at 902; Ex. S1 at 2.)  S/he is able to analyze, synthesize and recall a multitude of facts in diverse subject areas.  (Test. of Schroeder; tr. at 208-209; Ex. D14 at 1-4.)

(4)    As of May 2014, Student wanted to become a lawyer.  Since then, Student has expressed interest in being an immunologist or virologist.  (Test. of Mother; tr. at 1134.)  After graduating high school, Student hopes to attend a four-year college as well as graduate school. Student also expressed interest in languages, cultural anthropology, social justice and theater. (Exs. S1 at 3 and S3 at 4.)

(5)    Student's primary diagnosis for special education services is ASD.   His/her secondary diagnosis is emotional disturbance.  (Ex. S1 at 1.)  As a result of the ASD, Student has a deficit in organization, an executive function.  Student has difficulty organizing complex and multi-phase projects.  S/he also has difficulty tracking deadlines for multiple assignments.  When faced with such tasks, Student becomes overwhelmed and unable to focus on the work that must be done to complete the projects.  Student also has problems understanding the perspectives of others and relating to peers.  (Test. of Bounds; tr. at 902.)

(6)    As a result of Student's emotional disturbance, Student often views the statements and conduct of peers as threats to his/her emotional and physical well-being.[6]   When that happens, Student leaves class.  Sometimes Student calls his/her father for a ride home.  (Test. of Ewing; tr. at 66 and 79; Test. of Schroeder; tr. at 208-209; Test. of Bounds; tr. at 902-904.) Student also has difficulty regulating his/her emotions.  (Test. of Stober; tr. at 487.)  When s/he becomes upset, Student cannot focus on learning until s/he fully discusses whatever event or negative peer interaction upset him/her.  (Test. of Bounds; tr. at 901-904)  Mother and Student's teachers characterize these episodes as "emotional meltdowns."  (Test. of Mother; tr. at 1086 and 1093; Test. of Ewing; tr. at 66.)

(7)    Student turned 18 in the fall of the 2014-2015 school year.  However, as the District was aware, Student's parents have power of attorney for decisions regarding Student's education. (Test. of Clark; tr. at 560.)

(8)    Student's IEP team was comprised of Student, Parents, Parents' lawyer, and District teachers and staff.  (Ex. S1 at 1.)  The team held IEP meetings in May 2014 to develop an IEP for the 2014-2015 school year.  Student's Mother ("Mother") attended and participated in the meetings.  (Test. of Mother; tr. at 1095-1096.)

(9)    The IEP team agreed that Student's SDI need to be delivered to him/her one-on-one in a self-contained area, separate from the general education classrooms.  The team believed that after Student internalized the skills learned in a self-contained area, Student could generalize the

---

[6] Student also suffers from post-traumatic stress syndrome, which impacts his/her ability to attend school. (Test. of Mother; tr. 1087-1088; Ex. S1 at 2.)

skills with his/her peers and teachers in general education settings.  (Test. of Mother; tr. at 1095-1096.)

## Student's May 5, 2014 IEP Planning

(10)  As of May 2014, Student's projected high school graduation date was June 2016.[7] Student could not graduate with his/her peers, because of insufficient credits for a high school diploma.  S/he had lost credits while at the District high school because of extensive absences related to his/her disabilities.  (Test. of Clark; tr. at 607-608; Ex. D14 at 1-6.)

(11)  Student's May 4, 2015 IEP assessed his/her ability to learn, identified impediments to Student's ability to learn, articulated annual goals for him/her, and provided specialized instruction and services designed to help Student learn despite his/her disabilities.  (Ex. S1.)

## Behavior Support Plan

(12)  Student's May 5, 2014 IEP required that the District conduct a functional behavior assessment ("FBA") of Student, and then to develop a behavior support plan ("BSP") to help with behaviors that impeded Student's ability to learn.  (Ex. S1 at 4.)  Ms. Reinhardt conducted the FBA with input from Mother.  (Test. of Reinhardt; tr. at 371.)  The FBA identified problem behaviors such as Student becoming anxious and leaving the classroom, and misinterpreting peers' remarks as insults or threats.  (*Id.*)

(13)  Ms. Reinhardt completed the BSP on June 9, 2014.  (Ex. D6 at 1.)  Ms. Reinhardt finalized updates to the IEP in October 2014.  (Ex. D11 at 1.)

## IEP Annual Goals

(14)    The May 5, 2014 IEP contained annual goals for Student in four areas: social/emotional/behavioral, organizational/study skills, math, and transitions.  Given the fact that Student's biggest challenges to accessing his/her education were behavioral and organizational, Student had two goals in each of those categories.  Student's behavioral goals were:

> A.  In one instructional year, given scripted social scenarios, Student will demonstrate the ability to identify a social problem, the individual perspectives of at least two people, at minimum of one reason why the individuals have different perspectives and a potential solution to the given problem on 4 out of 5 consecutive opportunities.

> B.  In one instructional year, Student will demonstrate the ability [to] use an anxiety management strategy when [s/he] becomes anxious from a list of preselected and taught strategies (taking a

---

[7] Given Student's age, s/he presumably would have graduated from high school in June 2015 if s/he had not lost credits before attending AHS.

break in a safe space, using technology as a calming strategy, journal writing, or other strategy Student is comfortable with) and either remain in class/program or return to [his/her] typical daily schedule once calm on 3 out of 5 consecutive opportunities.

(Ex. S1 at 6.)

(15)  Student's organizational goals were:

C.  In one instructional year, given staff support and models, Student will improve [his/her] ability to be organized and demonstrate this by creating and using a system for tracking [his/her] materials, coursework and associated texts.

D.  Given staff support and models, Student will 1) use a graphic organizer to chunk down larger assignments into smaller components 3) [sic] sequence these smaller components of larger assignments and 4) create a timeline for completing smaller components in a way that allows for timely completion of the larger assignments.

(Ex. S1 at 6-7.)

(16)  Because Student was over 16, his/her IEP included a transition goal, designed to help him/her meet post-secondary education goals.  Student's transition goal was:

In one instructional year, Student will research the organizational skills need in the career of law or anthropology and choose one skill that [s/he] can develop now for use later in one of those two fields.

(Ex. S1 at 6-7.)

(17)  Finally, Student's math goal was:

In one instructional year, Student will demonstrate the skills to graph the equation of a line given the slope and the y-intercept, find the equation of a line between two points, find the slope of a line parallel and perpendicular to a given line and interpret the data provided by an equation of a line as related to a business or other real life situation.  [S/he] will score at least 75% accuracy on a curriculum based measure of these algebra skills.

(Ex. S1 at 7.)

**SDI**

(18)  To help Student meet his/her goals, the IEP required that a special education teacher provide Student specially designed instruction ("SDI") in a self-contained resource room.  The District was to provide 3600 minutes in transition services, 2700 minutes in study/organizational skills, 5400 minutes in mathematics, and 5400 minutes in behavior/social skills.  The SDI in all of these had to be delivered between May 13, 2014 and May 4, 2015.

(Ex. S1 at 8.)

**Related Services**

(19)  In addition to SDI, the IEP required that the District provide services designed to help Student learn.  From May 13, 2014 to May 4, 2015, the District was obligated to devote 120 minutes to selecting technology that would help Student to learn, and to assisting Student with that technology.  During that same time period, Student was to be provided accommodations such as the ability to take breaks and to talk to a trusted person.  (Ex. S1 at 8.)

**Alternative High School**

(20)  At the May IEP meetings, the IEP team had not decided the location where Student would attend school in the fall.  The District suggested that parents consider a private alternative high school at District expense.[8]  (Test. of Clark; tr. at 550-552.)  The alternate high school (AHS) selected by the District is recognized by the Oregon Department of Education as an alternative school, and is certified to meet state diploma requirements.  (Test. of Ewing; tr. at 64 and 128.)

(21)  AHS has a smaller student body than the District's high schools.  AHS' entire high school student population is between 50 and 60 students.  In class, there generally is one teacher for six to twelve students.  (Test. of Ewing; tr. at 77; Test. of Schroeder; tr. at 200.)  Student's IEP team believed that Student would benefit from smaller classrooms and increased time with his/her teachers.  (Ex. D8 at 1.)

(22)  The school philosophy is that every student has inherent good, and that decision-making should be democratic, and involve both students and teachers.  All incoming students agree to use conflict resolution involving mediation and perspective-sharing.  (Test. of Ewing; tr. at 52-56.)

(23)  Half of the students at AHS have IEPs, and many have academic and behavioral challenges.  (Test. of Schroeder; tr. at 200; Test. of Herer-Tjernlund; tr. at 503.)  Student is significantly more academically functional and motivated than most of AHS' other students. (Test. of Herer-Tjernlund; tr. at 518.)

---

[8] During the 2014-2015 and 2015-2016 school year, the District had approximately sixty students receiving education at private schools.  (Test. of Clark; tr. at 547.)

(24)    The District first referred Parents to AHS in the spring of 2014, months before Student began attending the school. (Test. of Clark; tr. at 553.) Over the summer of 2014, the District sent Parents an application and admission materials for AHS.    The District also introduced Parents to AHS Staff. (Ex. D7 at 4; Test. of Beard; tr. at 739-740.) In the weeks that followed, Student completed enrollment forms for AHS. (Test. of Beard; tr. at 737; Ex. D7 at 5.) On June 19, 2014, Student and his/her father visited and toured the AHS campus. (Ex. D7 at 5.)

(25)    An August 28, 2014 IEP meeting, which Parents attended, was held at AHS. (Test. of Ewing; tr. at 69-70; Test. of Beard; tr. at 738-739.) On August 27, 2014, the District emailed Mother and other members of the IEP team about the meeting:

> I am confirming the IEP meeting for Student to be held tomorrow at 1:00 p.m. at AHS * * [T]he goal of the meeting is to assist Student with the transition to AHS for this school year, make sure the school is aware of [his/her] accommodations and goals, and establish a workable safety and behavior support plan[. . . .]

(Ex. S21 at 6.)

(26)    Student and Parents agreed with the rest of the IEP team that Student should attend AHS in the fall of 2014. (Test. of Mother; tr. at 1112 and 1188-89; Test. of Reinhardt; tr. at 559-560; Ex. D26 at 1.) They were excited about Student's new beginning at AHS. (Test. of Ewing; tr. at 383-384.)

(27)    Parents' behavioral expert Monica Bounds agreed that AHS was a "safe" place for Student to receive educational services in the fall of 2014. (Test. of Bounds; tr. at 951.) And, Although Ms. Bounds was a member of Student's IEP team, she never recommended to the District, at any time, that Student should attend any school other than AHS. (Test. of Bounds; tr. at 972-973.)

### Prior Written Notice

(28)    The District never completed or provided to parents a written placement form or any other prior written notice reflecting the fact that Student would attend AHS at the beginning of the 2014-2015 school year. (Test. of Clark; tr. at 558-559; Test. of Beard; tr. at Exs. S5 and S6.)    This was an oversight caused, in part, by the fact that there was a transition between District case managers for Student between summer and fall 2014. (Test. of Beard; tr. at 741-744.)

### August 2014 IEP Meetings

(29)    After Student finished his/her summer classes at PTS, Student's IEP team held IEP meetings to update Student's IEP for the upcoming school year. (Test. of Ewing; tr. at 69.) The IEP team was comprised of Student, Parents, District representatives, AHS teachers Lisette Ewing and Chanci Herer-Tjerlund, the director of AHS, and Monica Bounds, a consultant who provided counseling and SDI to disabled students. (Ex. S4 at 1.)    Mother attended and

participated in those meetings.  (Test. of Clark; tr. at 571-572 and 589-590; Exs. D13 at 1 and S3 at 1.)

(30)  The IEP team agreed that Student needed professional counseling to support Student's move from PTS to AHS, and while attending AHS.  Mother advised the team that she was having difficulty with insurance that might cover counseling.  Ms. Clark, the District's Special Education administrator who approved District expenditures, told Mother that the District would provide and pay for counseling for Student.  (Test. of Clark; tr. at 571-572 and 603.)

### August 29, 2014 IEP

(31)  The IEP team assessed Student's performance levels as of August 2014:

> [S/he] is impacted in [his/her] functional performance from Post-Traumatic Stress Disorder, depression, and anxiety responses [that] prevent him/her from attending school, completing work, meeting, educational, [sic] performing well on tests.  * * *  In terms of [his/her] developmental performance, Student is gifted developmentally, academically talented and demonstrates many ASD features. . .  Student's needs vary and at times s/he will require increased adult support during times of high anxiety/stress.

(Ex. S2 at 2.)

(32)  When describing the impact of Student's disabilities on involvement and progress in a general education curriculum, the IEP team stated:

> Student's emotional disturbance and ASD result in Student not being able to attend a general education classroom at this time and [sic] very hard for him/her to work with his/her peers.  [S/he] often interprets others' behavior as negative towards him/her or towards an oppressed group.  [S/he] also expects others to have his/her level of insight and intellect which leads to difficult peer interactions and social relations.  If s/he is not completely comfortable in a class, [his/her] anxiety builds and [s/he] adopts an escape mentality.  This anxiety then prevents [him/her] from accessing the content and benefiting from instruction in the classroom.

(Ex. S2 at 2.)

(33)  The August 29, 2014 IEP required that a special education teacher provide Student the same amount of SDI as the May 5, 2014 IEP in a self-contained resource room over the same

time period of May 13, 2014 to May 4, 2015.[9]  The August 29, 2014 IEP added two additional items under Supplementary Aids/Services; Modifications; Accommodations.  The added items included a specific reference to Student's BSP, and required that a special education teacher work with Student for 180 minutes per day on the BSP.  (Ex. S2 at 10.)

(34)  The District was aware that although Student would be provided SDI and other services at AHS, the District retained responsibility for ensuring that Student's IEP was implemented and that all SDI was provided.  (Test. of Clark; tr. at 608.)

(35)  In the area of Related Services, the August 29, 2014 IEP added a number of services including counseling by a mental health specialist.  The IEP specifically stated that counseling was to begin on August 30, 2014, which was before school started that fall.  The District was to provide 2,160 minutes of counseling to Student between August 30, 2014 and May 4, 2015.  (Ex. S2 at 9.)

(36)  Both the May 5, 2014 and August 29, 2014 IEPs required that Student be provided SDI in a self-contained resource room.  (Exs. S1 at 8 and S2 at 10.)  As of the August 2014 IEP meetings, the District was aware that AHS had no such room, and that AHS did not remove students from general educations classrooms when providing SDI.  However, the District did not advise parents about AHS' facilities or practices.  The District also did not suggest that the requirement of a self-contained resource room be deleted from Student's August 29, 2014 IEP.  (Test. of Clark; tr. 611-613.)

## Distribution of the August 29, 2014 IEP

(37)  The 2014-2015 school year began after Labor Day in September 2014.  (Test. of Ewing; tr. at 74.)  A few weeks after school started, Student began having emotional meltdowns and leaving class.  Mother emailed Ms. Ewing, Student's special education teacher at AHS, to ask about counseling.  In response, Ms. Ewing expressed confusion about whether counseling was SDI or a related service under Student's IEP.  (Test. of Mother; tr. at 1119-1120.)

(38)  On October 3, 2014, Mother emailed Ms. Ewing, and asked if she had a copy of Student's August 29, 2014 IEP.  Mother stated:  "We too do not have an updated IEP, and I worry that without it, AHS can't reasonably be expected to implement an IEP that they don't have."  (Ex. S20 at 5.)

(39)  Mother did not receive a copy of the IEP until she received a draft version on October 6, 2014.  (Ex. D10 at 1.)  After reviewing the draft IEP, Mother wrote to the District the same day, indicating that the draft IEP appeared to contain all of the issues discussed by the IEP team.  (Ex. D10 at 2.)

(40)  Ms. Ewing received a draft of the August 29, 2014 IEP on October 7, 2014.  (Test. of Ewing; tr. at 132-133.)  She received the final IEP on November 19, 2014.  (Test. of Ewing; tr. at 134.

---

[9] The only difference in SDI was that the math SDI was changed from 5,400 minutes per year to 30 minutes per day.  (Ex. S2 at 9.)

### Delay in IEP's Counseling Services

(41)  After his/her first few weeks at AHS, Student began having problems communicating with peers, and having conflicts with them.  (Test. of Student, tr. at 1214-1216; Test. of Mother; tr. at 1116-1117.)   As a result, Student went to Ms. Ewing and asked for counseling.  On September 30, 2014, Ms. Ewing emailed the District, advising that Student was asking about counseling.  (Ex. S22 at 2.)

(42)  On October 30, 2014, Mother wrote to Student's case manager at the district, Barbara Keyworth.  Mother said:

> …[S]hould let you know we're reaching crisis levels with Student at AHS.  I'm working with staff over there, but [s/he] took one mental health day this week (Tuesday) and is threatening to drop [his/her] science classes two weeks before the term ends because [s/he] can't deal with the conflict with two peers.  [S/he] really needs help.

(Ex. S22 at 4.)

(43)  On October 1, 2014, Christopher Stober, a District autism consultant, wrote to several District employees, including K.C. Clark, the Special Education administrator, reminding them that counseling services were agreed on by the IEP team.  Believing that counseling services were important for Student, Mr. Stober asked:  "Can we get this going ASAP?"  (Ex. S23 at 1; Test. of Stober; tr. at 493.)

(44)  On November 19, 2014, Ms. Ewing, wrote to the District's behavioral consultant, Kim Reinhardt, as well as Student's case manager at the District, Barbara Keyworth.  Ms. Ewing advised that Student was having days when people that triggered emotional "meltdowns," prompting Student to call home for "a rescue."  (Ex. S22 at 10.)

(45)  The delay in securing counseling for Student was caused in part by rotator cuff and bicep injuries that Ms. Clark sustained in mid-August 2014.  As a result of the injuries, Ms. Clark worked a shortened schedule from August to December.  (Test. of Clark; tr. at 570-571.)

(46)  In October 2014, Ms. Clark met with Monica Bounds, an outside consultant, to discuss counseling services for Student.  In November, Ms. Clark prepared a contract for the services, and obtained approval from the District's finance department.  (Test. of Clark; tr. at 572-577.)  Counseling began on December 10, 2014, almost four months after the August 30, 2014 start date in Student's IEP.  (Test. of Clark; tr. at 577; Test. of Bounds; tr. at 899.)  From then until the end of the 2014-2015 school year, Ms. Bounds provided to Student 34.5 of the 36 counseling hours required by Student's August 29, 2014 IEP.  (Test. of Bound; tr. at 900.)

(47)  The counseling significantly helped Student to better manage his/her emotions and fears.  (Test. of Student; tr. at 1220.)  When Ms. Bounds first worked with Student, s/he was

crying one to three times per week and leaving school frequently. As of May 2015, Student largely stopped leaving school because of emotional meltdowns. (Test. of Student; tr. at 907.)

### Non-Implementation of SDI Services Required By the August 2014 IEP

(48)  Ms. Ewing was Student's special education teacher at AHS during the 2014-2015 school year. At that time, AHS had five full-time teachers. Ms. Ewing, as well as another teacher, worked part-time. The school had no instructional assistants. (Test. of Ewing; tr. at 59-60.) Ms. Ewing was the only AHS teacher who was licensed to provide SDI as a special education teacher. (Test. of Ewing; tr. at 121; Test. of Mother; tr. at 1114.) Ms. Ewing understood that she was the individual at AHS who was responsible for ensuring that Student received the SDI required in the August 29, 2014 IEP.

(49)  Ms. Ewing was at AHS three days a week. She focused on special education issues two days a week, on Tuesdays and Wednesdays. On Fridays, she taught a general education sewing class. (Ex. S22 at 17; Test. of Ewing, tr. at 127-128.) Student was in Ms. Ewing's sewing class. (Test. of Ewing; tr. at 52.) Although most classes have a one-to-six teacher-to-student ratio, Ms. Ewing had ten students in her sewing class. (*Id.* at 78.)

(50)  Ms. Ewing did not provide SDI to any AHS students in a self-contained resource room. According to Ms. Ewing, AHS does not take students out of general education classes to provide them SDI. If a student made a specific request for quiet time, Ms. Ewing sometimes allowed the student to use the library or Ms. Ewing's own office. (Test. of Ewing; tr. at 57 and 145.)

(51)  At a December 2014 meeting not attended by Student's parents, Ms. Ewing suggested to the District that Student's August 29, 2014 IEP be amended to delete its requirement that Student be provided SDI in a self-contained resource room. (Ex. S22 at 11.) No such deletion was ever made. (Ex. S2 at 9; Test. of Ewing; tr. at 135-137.)

(52)  Ms. Ewing contends that she spent 30 minutes to an hour on SDI with Student per week. However, she did not know whether this SDI was in behavioral/social skills or study/organization. (Test. of Ewing; tr. at 154.)

(53)  Ms. Ewing believes that she provided SDI to Student by periodically "checking in" with Student. For example, on Fridays, AHS' student body and teachers gather in a circle for a moment of silence. If Ms. Ewing encountered Student at that event, Ms. Ewing would ask Student how s/he was doing. (Test. of Ewing; tr. at 57 and 81.)

(54)  Similarly, during the Friday sewing class, Ms. Ewing asked Student how his/her week had gone and how things were at home. (Test. of Student; tr. at 1215-1216.) If Student reported that s/he had an unfinished assignment coming due, Ms. Ewing encouraged Student to discuss the project with the assigning teacher. (Test. of Ewing; tr. at 82-83.)

(55)  On one occasion, Student was upset about a remark made by a peer. Student came to Ms. Ewing in tears. Ms. Ewing brought the students together and helped them understand

each other's perspectives.  Ms. Ewing considered that interaction to be SDI.  (Test. of Ewing; tr. at 105-106.)

(56)  Ms. Ewing also believes that she provided SDI to Student because of the fact that the District had given Student an iPad:

> Q.  And for this student, what direct instruction did you provide?
>
> A.   So with Student's iPad, is Student able to get Student's assignments, do Student's outlines, how is Student filing Student's work, how is Student using Student's iPad[?][10]

(Test. of Ewing; tr. at 139-140.)

(57)  Ms. Ewing also thinks that many "teachable moments" occurring during sewing class constituted SDI for Student:

> A.  My own SDI was working much more on that second goals [anxiety management], which would be anxiety management strategies.  Lots of teachable moments in the day that give me the opportunity to work on those with Student.  The taking a break to safe places, using Student technology.

(Test. of Ewing; tr. at 145.)

(58)  When asked to explain how she implemented Student's organizational SDI, Ms. Ewing testified:

> And that may happen at lunchtime.  That may happen when I go into the class and sit next to Student.  It may happen that we have part of that discussion [sic] had when I check in with Student on Friday mornings.  It's very nonlinear.  Sorry.

(Test. of Ewing; tr. at 163-164.)

(59)  Three months after school started in the fall of 2014, Ms. Ewing told the District in a meeting about Student that it might not be feasible for a non-public school such as AHS to provide the study/organizational skills SDI required in Student's August 29, 2014 IEP.  (Test. of Ewing; tr. at 135-137.)  Ms. Clark agreed with this conclusion.  (Test. of Clark; tr. at 618.)  Neither of Student's Parents attended this meeting.

(60)  Student's August 29, 2014 IEP was never amended to eliminate or reduce its required SDI in study/organizational skills.  (Ex. S22 at 11; Test. of Ewing; tr. at 135-137.)  Additionally, although a meeting between Ms. Ewing and the District to go over Student's IEP

---

[10] Student's August 29, 2014 IEP states that use of an IPad or electronic similar device is a supplementary aid, not SDI.  (Ex. S2 at 9.)

page by page was discussed, the meeting never took place.  (Test. of Ewing; tr. at 137-138; Test. of Clark; tr. at 618.)  Because of work commitments, Mother was not available on the dates suggested by the District for the meeting.  Ms. Clark never followed up with additional dates for scheduling the meeting.  (Test. of Clark; tr. at 579 and 618-619.)

### No Records of SDI

(61)  Ms. Ewing kept no records of SDI that she gave to Student:

> Q.    Do you have any data of how many minutes of direct instruction you provided to these goals [of Student] during the 2014-2015 school year?
>
> A.  I could probably look back, and given the incidents that I had been keeping track of, there's documentation that way.  It's hard to keep track of those teachable moments when they happen.  They're not predictable.  And sometimes those teachable moments may be part on one day, checking in with that student, having them try to calm down, and then the next day coming back around.  No, I don't document specific time on that.

(Test. of Ewing; tr. at 146.)

> Q.  So do you know how many hours you provided that 2014-'15 school year in behavioral/social skills of direct SDI?
>
> A.  I could figure it out.
>
> By Judge McGorrin:
>
> Q.  Do you have that information with you here today?
>
> A.    I don't have that information because we use so much teachable moments.

(Test. of Ewing; tr. at 153.)

(62)  According to Ms. Ewing, other AHS teachers also provided SDI to Student during the 2014-2015 school year.  (Test. of Ewing; tr. at 173.)

(63)  Ms. Ewing never discussed with any other teachers at AHS about the number of SDI hours they would provide as opposed to the number that Ms. Ewing would provide.  (Test. of Ewing; tr. at 173.)  The other teachers never told Ms. Ewing how many SDI minutes they had given to Student.  (Test. of Ewing; tr. at 187.)

(64)  During the 2014-2015 school year, Ms. Herer-Tjernlund was Student's teacher at AHS for eight courses, including music, art, physical education, and community building.  Ms. Herer-Tjernlund also attended Student's IEP meetings.  (Test. of Herer-Tjernlund; tr. at 522.) When asked if she had any responsibility for implementing Student's IEPs, Ms. Herer-Tjernlund responded:

A.  I'm not exactly sure what you mean.

Q.  I guess at the start of that school year, other than transition, was there any other area that you felt responsible for coming out of that meeting for the student?

A.  I'm not quite sure –

JUDGE MCGORRIN:

Q.  What I believe Ms. Wicherath is asking you is the IEP contained goals for Student is that right?

A.  Yes.

Q.  Did you feel that you had a responsibility to make sure that those goals were met?

A.  I feel that way about all of our IEP – so yes.  But I don't think it's just the IEP.  Like we all want to meet our kids because we are always going to meet their needs beyond what the IEP says. So it's a support, but I still want to get to know them.  Most of my students need some kind of support in some kind of way that's not been articulated in the IEP.

Q.  Did you have a plan for that beginning of the school year to make sure that what the goals were from the IEP were going to be implemented for that student at the start of the school year.

A.  Like a specific plan?

Q.  I guess how did that work?  What did you do at the start of the school year?

A.  Any time we have a meeting about any kid that has needs or behavioral things, we talk about it as a staff and just kind of like a heads-up, this is their history, this is what it says they need and keep an eye out for this kind of behavior, this kind of trigger.  It's all very informal.  It's not like a written plan.  But

> [Student] is certainly not the only kid; so it wasn't like there was
> this hyper focus on [Student].

(Test. of Terer-Tjernlund; tr. at 523-525.)

### The District Did Not Respond to Parent's Complaints about the SDI

(65)  In October 2014, Mother told Ms. Clark at a meeting that Parents were concerned that SDI and related services in Student's IEPs were not being implemented.  Ms. Clark did not respond to or address Parents' concerns:

> Q.  Did you ever follow up with the parent to say, 'Look, these are the level of services that are being provided and these are who is providing them'?  Did you ever communicate that to the parent?
>
> A.  I don't think so.

(Test. of Clark; tr. at 622.)

(66)  In October 2014, Mother approached Barbara Keyworth, a District psychologist who was designated as the District case manager for Student for the 2014-2015 school year. Mother told Ms. Keyworth that she thought that Student was not receiving the services set forth in his/her IEP:

> Q.  Did there ever come a time where you had a discussion with Mom that she was concerned that some of the student's services that were spelled out in the IEP weren't being implemented at AHS School?
>
> A.  I think that we saw each other at Roosevelt Middle School, and so we talked about it.  But because I didn't  -- I don't – I didn't write it down, it just went in one ear and out the other.[11]

(Test. of Keyworth; tr. at 829-830.)

(67)  In an October 2014 meeting with District representatives KC Clark and Cheryl Linder, Mother also advised that Student was not getting his/her SDI.  (Test. of Mother; tr. at 1123-1124.)

### No Progress Reports As Required By the IEP

(68)  Student's October 2014 BSP, which was incorporated into Student's August 29, 2014 IEP, required that AHS teachers complete daily data cards.  The data was to help answer

---

[11] At the time, Ms. Keyworth was case manager for well over 100 students.  (Test. of Keyworth; tr. at 815.)

two questions:  "Is Plan Being Implemented?" and "Is Plan Making a Difference?"  However, Ms. Ewing did not keep track of the number of times that Student left class or the number of minutes that Student missed class because of emotional issues.  (Test. of Ewing; tr. at 149-150.)

(69)   Ms. Reinhardt never received data cards from any AHS staff.  (Test. of Reinhardt at 431; tr. at 431; Ex. S2 at 10.)

(70)   The October 2014 BSP also required that the District send monthly emails to Parents about Student's behavioral progress.  The BSP specifically named Ms. Reinhardt as the individual responsible for the emails.  (Ex. D11 at 8.)  Ms. Reinhardt did not send the monthly emails.  (Test. of Reinhardt; tr. at 431.)

(71)   In addition to the monthly emails and data cards in the BSP, the IEP also required that Student's progress at AHS be reported to parents via regular progress reports.  The IEP specified specific data for the progress reports.  One of the specific dates on which the reports were to be sent was December 10, 2014.  (Ex. S1 at 6.)  Ms. Ewing prepared no progress reports for parents.  (Test. of Ewing; tr. at 146.)

(72)   Ms. Ewing does not know how the dates for the written progress reports identified in the IEP were formulated.  (Test. of Ewing; tr. at 149.)  Ms. Ewing believed that if the progress reports were necessary, the District would have asked for them.  (Test. of Ewing; tr. at 178.)

(73)   As Ms. Ewing testified:

> Q.  And did this District approach you for the progress reports?
>
> A.  Not this year.  Not this year.

(Test. of Ewing; tr. at 148.)

(74)   Ms. Ewing collected no data on Student's progress toward meeting the goals in the August 29, 2014 IEP.  (Test. of Ewing; tr. at 147-148.)

(75)   Ms. Ewing admits that she made a mistake in not keeping mother informed of Student's progress:

> A. * * * And, yeah, I see that as a downfall that I did not contact Mother directly.

(Test. of Ewing; tr. at 178.)

**AHS' Transitions Classes**

(76)   AHS offer two courses each year that are called transitions courses.  The courses are "designed especially for seniors."  (Ex. D28 at 4.)  The first covers the exploration of career

and post-secondary education options (career transitions classes). The second covers personal financial issues such as insurance, mortgages, and taxes (finance transitions classes) (Test. of Schroeder; tr. at 224 and 226; Ex. D27 at 1.) These courses are offered to the entire student body and are taught in a general education classroom. The courses do not focus on students who have IEP transitional goals or SDI requirements. (Exs. D27 at 1-2 and D28 at 4.)

(77)    During the 2014-2015 school year, Paul Schroeder taught the transitions courses. He did not have a special education endorsement on his teaching license. (Test. of Clark; tr. at 615.) As of the August 2014 IEP meetings, the District was aware that Mr. Schroeder was not licensed to teach SDI. The District did not share that information with Student's parents. (Test. of Clark; tr. at 615.)

(78)    Mr. Schroeder did not attend any of Student's IEP meetings. He never saw Student's IEP. Mr. Schroeder provided no transitional SDI to Student during the 2014-2015 school year. (Test. of Schroeder; tr. at 247-248 and 253-255.)

(79)    During the 2014-2015 school year, Student took AHS finance transitions classes, which met for four hours per week for nine weeks. (Test. of Schroeder; tr. at 256-257.) Student decided not to take the career transitions classes during that school year because s/he wanted to take a drawing course offered in the same time slot.

(80)    Because Student would not be graduating for another year, s/he told AHS' teachers that s/he would take the career transitions classes the following school year. Student did not take the career explorations course during the 2015-2016 school year because the course was offered in the afternoon when Student was taking courses at the University of Oregon. (Test. of Ewing; tr. at 119.) Mother agreed with Student's choice, believing that Student would still get SDI in transitions. (Mother Test.; tr. at 1172-1173.)

(81)    Neither AHS nor the District provided Student any personalized transitions instruction during the 2014-2015 school year. (Test. of Ewing; tr. at 95; Test. of Herer-Tjernlund; tr. at 510.)

### May 2015-2016 IEP Meetings

(82)    In May 2015, the IEP team met to discuss goals for Student's 2015-2016 school year. Mother attended the meetings and participated in them. (Test. of Mother; tr. at 1133-1135.) Student's father also attended one of IEP meetings. (Ex. S3 at 1.)

(83)    After reviewing a draft of the May 5, 2015 IEP, Mother wrote to the District stating: "I believe the goals in transition are woefully inadequate. Student needs detailed transition goals." (Ex. S24 at 3; Test. of Mother; tr. at 1133-1135.)

(84)    In response, the IEP team agreed to add goals of preparing to take the SAT and/or ACT examinations, writing a resume, and completing at least five college applications. (Ex. S19 at 9; Test. of Mother; tr. at 1198; Test. of Bounds; tr. at 954 and 970-971; Test. of Keyworth; tr.

at 833-834.)  Those goals were not included in Student's May 5, 2015 IEP.  (Test. of Bounds; tr. at 954; Ex. D3 at 8.)

## Transition Planning

(85)  Because Student is over age 16, the IEP team must plan for Student's life after high school.  In drafting Student's original and amended IEPs for the 2015-2016 school year, the IEP team identified Student's objectives, which included attending college and living independently.  (Ex. S3 at 4.)[12]

(86)  The IEP team then was to conduct age-appropriate transition assessments. These assessments would determine the steps that Student needed to reach his/her post high school goals as well as Student's ability to take the steps.  (Test. of Sherman; tr. at 1244-1245.)  There are a variety of assessment tools ranging from commercial career surveys to research on colleges' entrance requirements.  (Test. of Sherman; tr. at 1264.)  Student's IEP used no assessment tool other than an informal interview of Student.  (Ex. S3 at 4.)  In summarizing Student's then present ability to reach his/her goals, the IEP team reiterated his/her educational goals.  The IEP did not describe Student's capability of meeting the goals.  *(Id.)*

(87)  The final component in transition planning is to identify high school studies that would assist Student in achieving his/her post-secondary goals.  The IEP team referenced AHS' two sets of transitions classes, as well as participating in career day and visiting a local community college.  (Ex. S3 at 4.)

## Distribution of Student's May 4, 2015 IEP

(88)  During summer recess on July 21, 2015, Mother requested a copy of the finalized May 4, 2015 IEP.  (Ex. S33 at 1.)  The District distributed a copy of the IEP to Mother and AHS staff on September 1, 2015, which was before school started that fall.  (Ex. D21 at 1.)

## Distribution of Student's November 12, 2015 IEP

(89)  On November 12, 2015, Student's IEP team drafted an amended IEP for the remainder of Student's 2015-2016 school year.  (Ex. S4.)  In December 2015, Cheryl Linder, the District's Director of Educational Support Services, learned that the IEP had not been distributed.  Ms. Linder arranged to have the IEP sent to Student's parents and AHS staff on December 31, 2015, which was before school resumed after winter break.  (Test. of Linder; tr. at 872.)

---

[12] Transition planning is in a separate section of the IEP, and requires a separate, although related, analysis than the one required for transitional SDI.   (Ex. S3 at 4 and 8.)

## Student's Academic Performance at AHS

(90)   AHS has four, nine-week terms in each academic year.  At the end of each term, Student's teachers graded on his/her performance when s/he attended class.  Absences were not reflected in grades.  However, if a student had a certain number of absences, the student would lose partial credit for the class.  The number of absences required to reduce the credit varied by class. (Test. of Ewing; tr. at 97.)

(91)   Report cards only showed class grades, absences, and teacher comments.  The report cards did not show how Student was progressing on meeting his/her IEP goals; the cards did not show the amount of SDI that the Student had received that term.  (Ex. D14 at 1-4.)

## First Term of the 2014-2015 School Year

(92)   During the first term, Student had seven classes:  Geometry, Community Building, Sewing, Physical Education, World History and two Science classes.  Student earned an A- in Geometry.  Student missed Geometry seven times that term.  (Ex. D14 at 1.)

(93)   Student passed the pass/fail course of Community Building, in which AHS students participate in community activities such as volunteering at the Boys and Girls Club.  (Ex. D14 at 1; Test. of Ewing; tr. at 58.)  Student never missed that class.  (Ex. D14 at 1.)

(94)   In Sewing, Student earned an A.  Student had zero absences.  (Ex. D14 at 1.)

(95)   In Physical Education ("PE"), Student earned an A for his/her performance when s/he attended the class.  Because s/he missed the class ten times, his/her credit for the class was reduced from 3.0 to 2.30.[13]  Absences exceeding eight in PE resulted in reduced credit.  Ms. Herer-Tjernlund, Student's teacher, noted:  "Even though you were probably injured the most, you had a great attitude throughout all of our activities."  Ms. Herer-Tjernlund recalled that some of Student's absences were due to injuries such as a hurt ankle and a bee sting.  (Ex. D14 at 1; Test. of Herer-Tjernlund; tr. at 509.)

(96)   In "What in the World," a history class, Student earned an A, missing the class six times.  The teacher remarked:  "You did a great job this term."  "Thanks for all of the insightful comments and analogies (even if some students miss them).  Your final was very good.  And, I really liked your paper on the Weimar Republic."  (Ex. D14 at 1.)

(97)   In "What is Science," a science class, Student earned an A.  The instructor wrote:  "An active mind with an ability to put things together in creative ways is always a pleasure.  I greatly appreciate your daily contributions to the class."  "You willingness to speak and help others is a gift."  Student missed this class seven times.  (Ex. D14 at 1.)

---

[13] AHS did not reduce students' credits for classes unless they missed 80 percent or more of the classes. (Test. of Ewing; tr. at 97.)

(98) Student missed the class Weird Science four times. S/he earned an A. The teacher commented: "You are curious and always willing to add your insights and thoughts to class. You are also very punny. You can decide if that is a compliment." (Ex. D14 at1.)

### Second Term of the 2014-2015 School Year

(99) In the second term, Student took Geometry, Government, Community Building, History, Singing/Songwriting, Sewing and Figure Drawing. Student's grade in Geometry was an A-. S/he had seven absences. (Ex. D14 at 2.)

(100) Student earned an A in Government and had six absences. The teacher said: "Nice work, Student. You wrote one of the best finals in the class. And, you gave a very powerful presentation on women's rights (or lack thereof) in Turkey. Thanks for the excellent daily contributions as well." (Ex. D14 at 2.)

(101) Student received a passing grade in Community Building. S/he never missed that class during the second term. (Ex. D14 at 2.)

(102) In U.S. History, Student's grade was an A. S/he had seven absences. The teacher commented: "It is a pleasure having you in this class." "You wrote a very good final. Your contributions to class discussions were excellent. And, I think the whole class appreciated learning more about Hawaii and its takeover by the U.S. Next time, however, let's try to get to your presentation before the last day so it does not feel so rushed." (Ex. D14 at 2.)

(103) Student earned an A+ in Singing/Songwriting. S/he missed the class five times. (Ex. D14 at 2.)

(104) Student took Sewing again during the second term. His/her grade was an A; s/he never missed the class. (Ex. D14 at 2.)

(105) Student received an A in Figure Drawing. S/he missed the class eleven times. As a result, Student received 2.20 credits for the class instead of 3.0. The teacher commented: "Though you had a lot of absences, you still produced a good amount of work this term. Each drawing showed a greater mastery in your understanding of proportion, dimension and shading." (Ex. D14 at 2.)

### Third Term of the 2014-2015 School Year

(106) Student's third term classes were Government, Community Building, Math, Sewing, History and Singing/Songwriting. His/her grade in Government was a B+ with seven absences. His/her instructor said: "I miss you when you are not here. In fact, you almost lost credit due to absence. I think that also contributed to some of your erroneous answers on the final. I also never received the written component of your assignment on Student's Bill. So, I had to reduce your grade." (Ex. D14 at 3.)

(107) Student passed Community Building. S/he had no absences. (Ex. D14 at 3.)

(108)  Student earned an A in Math.  (Ex. D14 at 3.)  Although AHS did not record the number of Student's absences for that class on his/her grade report, Student missed this class enough times to receive a reduced credit of 1.60 instead of 3.0.  (Test. of Ewing; tr. at 97.)  The instructor commented:  "Student, let me start off by just saying WOW!  You are so incredibly intelligent and your math skills are impressive.  I think by now, you probably know almost as much geometry as myself.  I am really looking forward to teaching you as much as I can because I know you will keep it with you and make great use of it throughout your life.  I am very happy to still have you in my math class.  I just hope that you will be there more days this term so that I can give you more of the credit you deserve."  (Ex. D14 at 3.)

(109)  Student took Sewing for the third time, earning an A.  S/he only missed class once.  (Ex. D14 at 3.)

(110)  Student received an A- in Transitions, missing the class six times.  The instructor stated:  "You did well in this class overall, Student.  You always offer a bunch of informative and insightful contributions to class discussions.  You did have a couple more weak spots on your final than I expected (probably due to a few more absences than normal).  Maybe check other student's notes to see what you might have missed?  Also, I never received that consumption report (and I'm not talking about tuberculosis)."  (Ex. D14 at 3.)

(111)  In the history class "Ancient Civilizations," Student earned an A+.  S/he had seven absences.  The teacher observed:  "Excellent work in this class, Student.  Your report on the Saami was informative and entertaining.  And your final was the best in the class. YAY!!!"  (Ex. D14 at 3.)

(112)  Student took Singing/Songwriting for the second time, and again received an A+.  S/he missed the class six times.  The instructor commented:  "I probably gave you an A+ last term too, but you are an exceptionally talented and prolific songwriter, a very captivating performer and a genuinely hard worker.  I am beyond impressed with you in this class.  Your commitment to your craft also inspired your peers to apply themselves more."  (Ex. D14 at 3.)

**Fourth Term of the 2014-2015 School Year**

(113)  During fourth term, Student took Community Building, Chemistry, Math, Singing/Songwriting, Role Playing, History and Theater.  Student had a passing grade in Community Building.  S/he had no absences.  (Ex. D14 at 4.)

(114)  Student's Chemistry grade was an A.  Student never missed the class.    (Ex. D14 at 4.)

(115)  In Math, Student earned an A; s/he had no absences.  The instructor said:  "Keep up the progress and you will go as far as you can imagine."  (Ex. D14 at 4.)

(116)  In Singing/Songwriting, Student received an A.  Student had four absences.  (Ex. D14 at 4.)

(117)   Student took "Role Playing" and earned an A.  Student never missed the class. (Ex. D14 at 4.)

(118)   In the history class "Cults, Kooks & Real Conspiracy," Student received an A-, and missed the class twice.  The instructor wrote: "Your class participation was very strong (as expected).  The only reason I gave you an A- was because you did not hand in your final paper (after we went over edits on your first submission).  That was the agreement we made (and I can change it if you make those corrections).  Don't let the minor deduction get in the way of having a fantastic summer!"  (Ex. D14 at 4.)

(119)  Student's final class of the fourth term was Intro to Theater.  Student earned an A, and had no absences.  (Ex. D14 at 4.)

## Student's Absences at AHS

(120)   Student's most significant barrier to his/her education, which resulted in the majority of his/her absences were, as mother and teachers referred to them, Student's emotional meltdowns.  Student may have missed a class or two of PE because of a sprained ankle or a bee sting.  S/he also missed class when Father or a sibling was ill.  (Test. of Herer-Tjerlund; tr. at 536.)  However, the majority of his/her absences were due to emotional issues.  (Test. of Mother; tr. at 1188.)

(121)   Student's attendance improved, however, during his/her 2014-2015 school year.  In the first term, s/he had 35 absences, 25 of which were in academic classes as opposed to physical education.   Second term, student had 36 absences, 20 of which were in academic classes, as opposed to singing and drawing classes.  Third term, Student had 35 absences, 22 of which were in academic classes, as opposed to sewing, singing, and transitions.[14]  Fourth term, Student had a total of six absences, only two of which were in an academic class as opposed to singing.  (Ex. D14 at 1-4.)

(122)   Even with the three reduced credits from Student's absences, Student would have enough credits to graduate from AHS in summer of 2016 with a standard diploma.  (Clark Test.; tr. at 606-607.)  However, because Student dropped a Japanese class at the University of Oregon, s/he will not have completed the foreign language requirement for his/her high school diploma that is required for admission to a four-year university.  Parents therefore have opted to delay Student's high school graduation until December 2016.  (*Id.*)

## Student's Performance on State Required OAKS Examination

(123)   After Student's 2014-2015 school year, s/he took an examination required by the State of Oregon for state diplomas.  For reading, the passing score was 236.  Student passed with

---

[14] The report card shows no absences in math.  However, Ms. Ewing testified that Student lost credit in math.  Student's math grade was reduced from 3.0 to 1.6 credits.  As a result, student had 8 or more absences in math.  Thus, the total of 35 absences for third term assumes 8 absences in math.  (Test. of Ewing; tr. at 97-98.)

a score of 249.  For writing, the passing score was 40, and Student's score was 45.  Student also passed science and social studies with scores of 257 and 256.  Ms. Ewing had never seen a science score that high.  (Ex. S16 at 5; Test. of Ewing; tr. at 116 and 176-177.)

### Student's Academic Performance in University Courses

(124)  To be eligible to attend a four-year university, Student must have completed foreign language and lab sciences courses on his/her high school diploma.  Because AHS does not offer these courses, the District paid for Student to take these courses at the University of Oregon while s/he is still attending AHS.  (Test. of Clark; tr. at 562-564 and 583-584; Test. of Ewing; tr. at 67-69.)

(125)  During the summer of 2015, Student took 101, 102 and 103 Japanese, earning grades of A+, A and A, and 15 college credits.  (Ex. D14 at 7.)  Student also took Geology, receiving a B.  The Japanese and Geology courses included freshman, sophomore and possibly upper class students.  Additionally, as of March 2016, Student was taking a math class at the university.  (Test. of Bounds; tr. at 944-945.)  Student's grade point average at the University of Oregon as of March 2016 was 3.9.  (Test. of Mother; tr. at 1151 and 1182.)  While taking the University of Oregon classes, Student made a friend with whom s/he has socialized, thereby demonstrating a good relationship with at least one peer.  (Test. of Ewing; tr. at 102.)

(126)  Student signed up for another Japanese course in the fall of 2015.  Initially, Student was wait-listed for the course.  Student learned during the first week of the term that s/he had been admitted into the course.  Because s/he could not access the course syllabus or assignment for the first week, Student dropped the course.  (Test. of Bounds; tr. at 966.)

### CONCLUSIONS OF LAW

1. The District materially failed to implement Student's August 29, 2014 IEP by not providing:  a)  SDI in transitional, organizational and study skills, and social and behavioral skills;  b)  counseling, a related service;  and c) progress reports to Parents.

2. The District failed to create or provide Parents prior written notice of the location for Student's 2014-2015 school year educational services, but that omission did not cause educational harm to Student.

3. The District did not fail to timely provide Parents with Student's August 29, 2014 IEP for the 2014-2015 school year.

4. The District did not fail to timely provide Parents with Student's May 4, 2015 and November 12, 2015 IEPs for the 2015-2016 school year.

5. The District failed to timely provide to the IEP team Student's August 29, 2014 IEP for the 2014-2015 school year, but the delay did not cause educational harm to Student.

6. The District did not fail to timely provide to the IEP team Student's May 4, 2015 and November 12, 2015 IEPs for the 2015-2016 school year.

7. The District failed to use appropriate transitional assessments in developing Student's IEPs for the 2015-2016 school year, and failed to provide adequate transitional services for that school year, thereby causing educational harm to Student.

8. The District failed to include in Student's IEPs for the 2015-2016 school year goals agreed-upon by the IEP team, thereby causing educational harm to Student.

## OPINION

### Public Education Requirements under the IDEA

The purpose of the IDEA is to ensure that children with disabilities are provided a FAPE by giving them special education and related services designed to meet their unique needs. 20 U.S.C. §1400(d)(1). The IDEA focuses more on "open[ing] the door of public education to handicapped children * * * than * * * guarantee[ing] any particular level of education once inside. *Board of Educ. Of Hendrick Hudson School Dist. v. Rowley,* 458 U.S. 176, 203-204 (1982). Thus, an * * * " 'appropriate' public education does not mean the absolutely best or 'potential maximizing' education for the individual child." *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987).

A FAPE is "special education and related services" that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

The IEP is the framework that schools use to provide FAPE. An IEP is a written report designed uniquely for each student that contains:

> (1) The student's "present levels of academic achievement and functional performance;
> (2) A statement of measurable annual academic and functional goals;
> (3) a description of "how the child's progress toward meeting the annual goals . . . will be measured";
> (4) a statement of the services and program modifications that the school will provide for the child;

(5)   a description of the extent "to which the child will not participate with nondisabled children in the regular class;"
(6)   a statement of the accommodations and modifications necessary to measure the child's performance "on State and districtwide assessments"; and
(7)   the projected beginning date and duration of the services and modifications.

34 C.F.R. § 300.320.

## Burden of Proof

The burden of proof in an administrative hearing of a FAPE challenge is on the party seeking relief. *Schaffer v. Weast,* 546 U.S. 49, 58 (2005). Where, as here, parents contend that the school did not implement an IEP, and assert procedural violations of the IDEA, parents have the burden of proof. *Van Duyn v. Baker School Dist.,* 502 F.3d 811, 819-820 (9th Cir. 2007.)[15]

The standard of proof in an administrative hearing is preponderance of the evidence. *Cook v. Employment Div.* 47 Or App 437 (1980) (in the absence of legislation specifying a different standard, the standard of proof in an administrative hearing is preponderance of the evidence). Proof by a preponderance of the evidence means that the fact finder is persuaded that the facts asserted are more likely true than not true. *Riley Hill General Contractors v. Tandy Corp.,* 303 Or 390 (1989).

Parents raise a number of issues that they contend constitute a denial of a FAPE. First, Parents claim that the District failed to implement Student's IEP during the 2014-2015 school year by not providing Student SDI, counseling, and progress reports. Next, Parents assert a number of procedural IDEA violations.

Parents contend that the District failed to timely provide Parents and Student's teachers with Student's August 29, 2014, May 4, 2015, and November 12, 2015 IEPs. Parents also allege that the District did not provide Parents with a written placement form or prior written notice that Student would attend AHS in the fall of 2014. Additionally, Parents assert that the District failed to use appropriate transitional assessments when formulating Student's transitional goals for the 2015-2016 school year. Parents contend that, as a result, the IEP team did not develop appropriate transitional services for Student. Finally, Parents claim that the District did not include agreed-upon goals in Student's IEPs for the 2015-2016 school years.

Parents had the burden of proving each of these claims by a preponderance of evidence. Each claim is addressed separately below.

---

[15] Although Parents refer to Oregon Department of Education's (ODE's) complaint investigation report in their original and amended due process complaints and in their post-hearing brief, they cite no case law suggesting that the ODE's findings are binding in the instant administrative proceeding. Thus, in this Final Order, ALJ McGorrin makes *de novo* factual findings based on the evidence presented at the due process hearing.

### Implementation of 2014-2015 School Year IEPs

Parent's first and most significant claim focuses on Student's 2014-2015 school year at AHS. Parents contend that the District violated the IDEA by not implementing key provisions of Student's August 29, 2014 IEP, which was the blueprint for that school year. Specifically, Parents claim that the District did not provide Student SDI, counseling, and progress reports required by Student's IEP.

The District argues that it did provide the instruction, service and communications. The District's more salient argument is that even if the District failed to implement all of the IEP's requirements, Student suffered no educational harm. Because there was no harm, the District argues, no IDEA violation occurred. The District's failure to meet its IEP commitments, however, was pervasive, resulting in an IDEA violation. Given the particular facts of this case, Student's excellent academic performance during the 2014-2015 school year did not obviate the District's material failure to implement the IEP.

As recognized by the United States Supreme Court in *Rowley*, the foundation of special education under the IDEA is instruction specifically and uniquely designed to allow a particular student to learn despite that student's disabilities. *Rowley*, 458 U.S. at 181. Accordingly, the IDEA requires the development and distillation of that instruction into a written individualized education plan or IEP. To ensure that eligible students receive instruction in a form that will enable them to learn, the IDEA contains detailed requirements about each step of developing the IEP from attendance at the IEP meetings, to assessments of students' abilities, to the formulation of detailed goals and instruction. The end result is a roadmap of specialized instruction for each student. A one-size-for-all approach does not apply to IEPs.

### The Materiality Standard

The Ninth Circuit ruled in *Van Duyn,* 481 F.3d at 811, that when a student proves that a school did not implement SDI required by an IEP, the school may nevertheless prevail if it can show that there was only a small discrepancy between the promised services and the services actually delivered. The court held that a school does not violate the IDEA unless it *materially* fails to implement the IEP. (*Id.* at 822.)

The Ninth Circuit defined a material failure as "more than a minor discrepancy between the services provided to a disabled child and those required by the IEP." The court held that evidence that a student progressed during the school year covered by the IEP suggests that the shortfall was minor. Because the student was not harmed, the court reasoned, the loss of instruction was insignificant and did not constitute a FAPE violation. *Van Duyn*, 502 F.3d at 825.

In *Van Duyn*, parents claimed that a school failed to provide a portion of an IEP's SDI and other services to a 13-year old autistic boy. The parents offered evidence that the school did not give the student all of the IEP's required reading and writing instruction, that a BSP was largely followed, but some details were not implemented, that quarterly report cards addressed some but not all of student's goals, and that student should have received instruction in a self-

contained classroom despite the fact that he had a full-time personal instructional aide at his side in the general education classroom.  (*Id.* at 824.)

The Ninth Circuit held that these IEP omissions were minor.  The court noted that the student did eventually receive all of the promised reading and writing instruction.  The court found that the school implemented the substance, if not every detail, of the student's BSP.  Parents' expectation that the BSP would be implemented in middle school exactly as it was in elementary school was neither required by the IEP nor realistic.  (*Id.* at 784.)   Similarly, the court held that quarterly report cards tracked many, if not all, of the student's IEP goals and short-term objectives.  (*Id.* at 822.)

The court also held that the student received essentially the same specially designed instruction he would have received in a self-contained classroom.  The court based that finding on the constant attention that the student got from his personal instructional aide, as well as frequent attention from teachers.  Moreover, the court found, student's projects typically were designed especially for him and were unrelated to his peers' assignments.  (*Id.*)

Against the backdrop of the school's substantial compliance with the IEP, the Ninth Circuit noted that during the period covering the due process complaint, the student's behavior improved and he progressed in most academic areas.  The court found that this evidence bolstered the conclusion that the discrepancies between the IEP and the delivered services were minor.  (*Id.* at 822.)

*Van Duyn*, therefore, was a *partial* failure-to-implement case.  In each of the areas where the student claimed that the district had not complied with the IEP, the school showed that student received *some or most* of the promised instruction.

In *dicta*, the Ninth Circuit noted that if the school had not subsequently provided all five missing hours of ten promised weekly hours of SDI, the District would have materially failed to implement Van Duyn's IEP.  The court observed:  "We agree that the initial five-hour shortfall was a material implementation failure."  (*Id.* at 823.)  The court stated:

> The materiality standard does not require that the child suffer demonstrable educational harm in order to prevail on a failure-to-implement-claim where the failure is substantial.[16]

(*Id.* at 822.)

The Ninth Circuit envisioned, therefore, a case where the failure to implement is so pervasive, that the failure, in and of itself, with no accompanying proof of harm, constitutes a violation of the IDEA.

---

[16] Other federal circuits have adopted the "materiality" analysis when assessing a school's failure to implement an IEP.  *See, e.g., Neosho R-V Sch. Dist. v.* Clark, 315 F.3d 1022 (8th Cir. 2003); *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341 (5th Cir. 2000);

**The District Failed to Implement the IEP's SDI**

Student's IEP for the 2014-2015 school year stated that Student would receive the following SDI in a self-contained resource room:  3600 minutes or 60 hours of transition services, 2700 minutes or 45 hours of study/organization skills, 30 minutes per day of mathematics, and 5400 or 90 hours of behavior/social skills. The SDI had to be delivered between May 13, 2014 to May 4, 2015.  AHS had four nine-week terms.  Thus, if the District provided the SDI during school weeks, Student would need to receive approximately 7.9 hours per week of SDI.

AHS, however, only had one teacher who was licensed to provide special education:  Ms. Ewing, and she worked part-time.  On a typical work week, Ms. Ewing was only at AHS three days per week.

In addition, Student was not AHS' only special education student.  Of the school population of 50-60 students, roughly half were students with disabilities and IEPs.  Ms. Ewing therefore was responsible for the implementation of about 25-30 IEPs during her shortened work week.

When asked what SDI she provided Student, Ms. Ewing testified that she gave Student many "teachable moments."  For example, Ms. Ewing "checked in" with Student at Friday morning all-school gatherings, and in Friday sewing general education classes.  During the check-ins, Ms. Ewing asked Student how things were going.  If Student responded that s/he was having difficulties completing an assignment, Ms. Ewing suggested that Student talk to the assigning teacher.  If Student had a conflict with a peer, Ms. Ewing used conflict resolution methods that AHS mandated be used school-wide.  Ms. Ewing also cited Student's use of an iPad as an example of the SDI that Ms. Ewing provided Student.

Allowing Student to use an electronic device was not SDI, but was a supplementary aid under Student's August 29, 2014 IEP.  Additionally, Ms. Ewing's "teachable moments" did not constitute SDI.  The techniques were generic, and could have been used for any AHS student, regardless of whether the student had an IEP.  The techniques did not address transitions, study/organizational skills, mathematics, and behavior/social skills SDI.  The techniques did not track Student's IEP goals in those areas.  The techniques did not mirror methods developed in Student's BSP.  Ms. Ewing therefore did not provide SDI to Student.

Even if some of Ms. Ewing's interactions with Student could be characterized as SDI, Ms. Ewing did not deliver the required number of SDI hours.  Ms. Ewing estimated that she spent 30-60 minutes per week with Student in one-on-one interactions.  Thus, Ms. Ewing could not possibly have provided Student the 7.9 hours per week of specially designed instruction that Student's IEP required.  Moreover, Ms. Ewing kept no records of the SDI she provided to Student.  Ms. Ewing's failure to keep records of the SDI supports the conclusion that she did not actually provide the instruction.

The District contends that, in addition to Ms. Ewing, other AHS teachers provided SDI to Student.  For example, the District offered evidence that Mr. Schroeder helped Student with

breaking assignments into smaller pieces.  However, Mr. Schroder and the other AHS teachers were not licensed special education teachers.  Student's IEP required that SDI be given by special education teachers or providers.

Moreover, the District offered no evidence that the other teachers were supervised by or acting at Ms. Ewing's direction when they provided SDI to Student.  Finally, as Ms. Ewing admitted, she never discussed with other AHS teachers the number of SDI hours that they would provide.  Similarly, the other teachers never advised Ms. Ewing of the hours of SDI they supposedly gave to Student.  The fact that there were no such discussions suggests that general education teachers at AHS did not provide SDI to Student.

### Self-Contained Resource Room

Student's IEP stated that the location for his/her SDI was a self-contained resource room.  Ms. Clark and Ms. Ewing, both of whom were on Student's IEP team, were aware when the IEP was being developed that AHS had no such room.  Ms. Clark and Ms. Ewing also knew that AHS did not remove students from general education classrooms to deliver SDI.  However, Ms. Clark and Ms. Ewing did not inform Parents that AHS could not meet these requirements.  Instead of ignoring the situation, the solution was to discuss the situation with the IEP team.  The team then could have revised the IEP, and arranged for one-on-one instruction in an appropriate physical location at AHS or elsewhere.  The team pursued neither option.  As a result, Student's august 29, 2014 IEP could not be implemented at AHS as written.

### Transitions SDI

The District contends that its personal finance classes called "finance transitions," which Student took third term, satisfied some of the transitions SDI hours required by Student's IEP.  The District claims that the balance of the transitions SDI hours would have been satisfied if Student had taken the "career transitions" classes instead of taking a drawing class.  The District argues that because Student did not take the "career transitions" classes, s/he waived part of his/her transitions SDI.  None of these arguments are persuasive.

Both sets of classes were not designed for Student, but were, as AHS advertised: "designed especially for seniors."  Thus, any senior at AHS could take the elective classes, which were taught in a general education classroom by a teacher not licensed in special education.  Accordingly, neither the "finance transitions" nor "career transitions" classes were SDI.  Thus, the "finance transitions" classes did not count toward Student's transitions SDI.  For the same reason, Student did not waive the reminder of his/her transitions SDI by not taking AHS' "career transitions" classes.

As a result, AHS, and ultimately the District, failed to provide Student the SDI in Student's August 29, 2014 IEP in all four areas required in Student's August 29, 2014 IEP: social/emotional/behavioral, organizational/study, math, and transition.[17]

---

[17] In their due process complaints and Post-Hearing Brief, Parents do not seek compensatory education for the District's failure to provide math SDI to Student.  In the Remedy section of this Final Order, Student therefore is not awarded compensatory education in math.  However, the District's failure to

**Counseling**

Student's August 29, 2014 IEP provided for 36 hours of professional counseling for Student, a related service that his/her May 5, 2014 IEP had not required. Presumably, the IEP team added counseling to help Student cope with the stress caused by a return to a partial general education setting.

After beginning school, Student quickly decompensated, having emotional meltdowns and leaving class. Despite multiple demands from Student, Mother, Ms. Ewing and District staff, the District did not provide any counseling to Student until December 10, 2014, which was almost four months later than promised. Given that emotional issues were at the core of Student's disabilities, the delay in counseling was a substantial IEP implementation failure.

**Progress Reports**

The District did not dispute Parents' evidence that the progress reports required by Student's 2014-2015 IEP and by the BSP incorporated therein were never provided to Parents. The District contends, however, that it provided all the information that Parents needed in grade reports.

The grade reports, however, were snapshots at the end of the term. They were not updates during the term. Moreover, the grade reports only included letter grades, number of absences, and teacher comments. The grade reports did not include any discussion of Student's IEP goals, his/her progress toward them, or the District's progress in providing SDI to Student.

Additionally, the grade reports did not indicate how or whether Student was progressing on managing his/her problem behaviors. The grade reports were also silent about whether Student's BSP was working. Thus, the grade reports did not substitute for the required progress reports.

As a result of the District's failure to provide Student with the SDI, counseling, and progress reports, the District materially failed to implement Student's SDI. Thus, as in *Turner v. District of Columbia*, 952 F. Supp. 2d 31 (2013), discussed below, Student was denied a FAPE.

In *Turner*, 952 F. Supp. 2d at 31, a student moved from a private school to a public school during a school year. The student's IEP required that he receive six and a half hours of weekly SDI in a self-contained room. The other six and a half hours of SDI were to be provided by a special education teacher in a general education classroom. The school delivered the required self-contained room SDI. However, the balance of the SDI was not provided by a special education teacher for the first three months of the student's tenure at the public school. Instead, the instruction was given by teachers and instructors who did not have special education qualifications.

---

provide SDI in all areas is relevant to the finding herein that the District materially failed to implement Student's IEP.

The hearing officer who conducted the due process hearing concluded that the failure of the school to provide a qualified special education teacher for the general education SDI was a minor deviation that did not deprive the student of FAPE.  In so ruling, the hearing officer noted that the student had received 2.5 more hours of self-contained room SDI per week outside than the IEP required.

The district court reversed, holding:

> Because of the significant difference between the proportion of special education in the general education context mandated [eleven hours] and that which was actually received [zero hours], [t]he Hearing Officer was incorrect in her findings that [the student] was not denied a FAPE.

The district court found that the only issue was whether the school's failure to deliver the SDI was "substantial or significant," or, in other words, " whether the [school]'s failure to deliver the services was 'material." The district court held that the school's non-implementation of the IEP was material.  (*Id.* at 37.)

The Fourth Circuit reached a similar conclusion.  *See, Sumter Co. School District v. Heffeman*, 642 F.3d 478, 483 (4th Cir. 2011) (School's failure to provide five to eight hours of the required fifteen hours of SDI combined with the school ignoring the IEP's specified teaching techniques constituted a material failure to implement the IEP.)

As in these cases, the District's failure to provide Student with any of the SDI or progress reports or timely counseling was substantial and significant.  Accordingly, the District's failure to deliver the instruction, reports and counseling was material, thereby denying Student a FAPE.

### Procedural Claims

In enacting the IDEA, Congress included many procedural safeguards protecting the rights of students and parents.  A hallmark of the IDEA is its emphasis on parental involvement in a child's IEP.  As stated by the U.S. Supreme Court in *Rowley*, 458 U.S. 176:

> [W]e think that the importance Congress attached to these procedural safeguards cannot be gainsaid.  It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard.  We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

(*Id.* at 205.)

Court have routinely held, however, that a denial of a FAPE occurs only when "procedural inadequacies * * * result in the loss of educational opportunity * * * or seriously infringe on the parent[s]' opportunity to participate in the IEP formulation process." *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 938 (9th Cir. 2007); *W.G. v. Bd. Of Trustees of Target Range School D.* 960 F2d 1479, 1484 (9th Cir 1992).

Therefore, to prevail on their procedural claims, Parents must first demonstrate that the District did not follow a procedure required by the IDEA. Second, Parents must demonstrate that the violation caused educational harm to Student or deprived Parents from participating in formulating Students' IEPs.

### AHS Placement Documentation

Parents' first procedural claim is that the District committed a procedural violation by not giving Parents prior written notice before placing Student at AHS in the fall of 2014. Parents showed that the District failed to properly document Student's placement at AHS. However, Parents did not show that this violation harmed Student or deprived Parents' of their rights to participate in Student's education.

The IDEA's regulations require that schools provide written notice to parents before changing students' educational placement. The notice requirements are …. "[D]esigned to assure that parents will have meaningful input into decisions that affect the education of children with special needs." *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 58 (1st Cir. 2002). 34 C.F.R. 300.503(a) provides:

> (a) *Notice.* Written notice that meets the requirements of paragraph (b) of this section must be given to the parents of a child with a disability a reasonable time before the public agency—
>
> (1) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or
>
> (2) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.
>
> (b) *Content of notice.* The notice required under paragraph (a) of this section must include—
>
> (1) A description of the action proposed or refused by the agency;
>
> (2) An explanation of why the agency proposes or refuses to take the action;

(3) A description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;

(4) A statement that the parents of a child with a disability have protection under the procedural safeguards of this part and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;

(5) Sources for parents to contact to obtain assistance in understanding the provisions of this part;

(6) A description of other options that the IEP Team considered and the reasons why those options were rejected; and

(7) A description of other factors that are relevant to the agency's proposal or refusal.[18]

The District gave Parents no prior written notice that Student would be attending AHS in the fall of 2014. However, the District did not make the placement decision without Parents' knowledge or participation. The contrary is true. Parents were not only aware of the decision, they participated in the IEP team meetings regarding Student's placement. Indeed, AHS was their choice.

Months before Student began attending AHS, the District provided Parents with AHS application and admission materials. Student and Father visited the campus during the summer of 2014. Mother attended an August 28, 2014 IEP meeting at AHS. Before the meeting, the District sent Mother an email confirming that the purpose of the meeting was to assist Student in his/her upcoming transition to AHS.

Parents never voiced any opposition to Student attending AHS. Instead, Student's family expressed excitement about the prospect. Indeed, Ms. Bounds, Parents' behavioral expert witness agreed with placing Student at AHS, concluding that AHS was a "safe place" for Student.

Mother suggested during the due process hearing that if she had known that AHS did not provide special instruction in a self-contained resource room, she would not have agreed to Student attending the school. However, in their due process complaints, Parents did not challenge the decision to place Student at AHS. Instead, their claim is limited to whether the District gave Parents written notice about the decision.

At the due process hearing, Parents offered no evidence that they or Ms. Bounds ever requested that Student's services be provided at some other location, either before or after Student began attending AHS. Parents also offered no evidence that as of fall 2014, a better or even different placement option existed. And, in neither their due process complaints nor their Post-Hearing Brief did Parents seek as a remedy a change in Student's placement at AHS.

---

[18] Oregon's special education law contains the same requirements. *See*, ORS 343.159(b).

Parents therefore did not prove that the lack of a written placement document or prior written notice caused any harm to Student. Additionally, because Parents agreed to Student attending AHS, Parents have not shown that their participation in Student's education was restricted. As a result, Parents have not shown that the District's failure to provide a prior written notice of the AHS placement constituted a denial of FAPE. *See, e.g., Forest Grove Sch. Dist. v. Student*, 2014 WL 2592654 at 26 (D. Or. 2014) (Failure to timely send prior written notice was a harmless procedural error when parents gave meaningful input into the school's decision, and the school gave parents actual notice before the decision was implemented).

### Distribution to Parents of August 29, 2014, May 4, 2015 and November 12, 2015 IEPs

Parents' second procedural violation claim is that the District denied Student a FAPE by not timely providing Parents with copies of Student's August 29, 2014, May 4, 2014 and November 12, 2015 IEPs. Parents do not prevail on this claim because they did not show that the District violated the IDEA in distributing the IEPs.

Mother participated in IEP meetings where Student's August 29, 2014, May 4, 2015 and November 12, 2015 IEPs were developed. Student's Father was at the IEP meetings for Student's May 4, 2015 and November 12, 2015 IEPs.

Parents did not get a copy of Student's August 29, 2014 IEP until October 6, 2014, approximately a month after school began that fall. On July 21, 2015, Mother asked for the May 4, 2015 IEP. The District did not forward the IEP to Mother until September 1, 2015, a few days before school started in September 2015. Parents did not get a copy of Student's November 12, 2015 IEP until December 31, 2015, which was during winter break and before classes resumed.

However neither the IDEA nor its regulations include any deadlines for schools to distribute IEPs to parents. Parents rely on 34 C.F.R. 300.332(f), which provides: "[T]he public agency must give the parent a copy of the child's IEP at no cost to the parent."[19] The regulation, however, does not address any timeframe for schools to provide IEPs to parents.

Parents also cited OAR 581-015-2225(3)(b). That rule states: "Upon request, the parent must be provided with a revised copy of the IEP with the amendments incorporated." Again, that rule provides no deadline for the school to give IEPs to parents.

Even if Parents had proven a violation, they did not show that the District's delay in providing the IEPs prevented Parents from actively participating in the development of Student's IEPs. The evidence shows that Parents attended the IEP meetings, and provided suggestions for IEP goals both at and between meetings. Additionally, Student's goals in the August 29, 2014 IEP were unchanged from the May 5, 2014 IEP. The most significant changes were to add counseling as a related service and the BSP as a supplementary aid. Finally, Parents offered no evidence indicating that the timing of their receipt of the IEPs hindered their participation in Student's education in any way.

---

[19] OAR 581-015-2225(3)(b) imposes the same duty.

### Distribution to Teachers of IEPs

Parents' next procedural claim is related to the last one. Here, Parents claim that the District's untimely distributed Student's IEPs to Student's teachers. The record shows that the District did violate the IDEA by untimely distributing the August 29, 2014 IEP. However, that delay did not cause Student educational harm. The District did not violate the IDEA with regard to its distribution of the May 4, 2015 and November 12, 2015 IEPs.

34 C.F.R. § 300.323 requires that at the beginning of each school year, each school must have an IEP in effect for each disabled student. The regulation also requires that the IEPs be accessible to the special education teacher and other providers responsible for its implementation, and that those individuals be advised of their responsibilities. The regulation provides in relevant part:

> (1) The child's IEP is accessible to each regular education teacher, special education teacher, related services provider, and any other service provider who is responsible for its implementation; and
>
> (2) Each teacher and provider described in paragraph (d)(1) of this section is informed of—
>
> (i) His or her specific responsibilities related to implementing the child's IEP; and
>
> (ii) The specific accommodations, modifications, and supports that must be provided for the child in accordance with the IEP.[20]

34 C.F.R. 300.323(d)(1) and (2).

With regard to the August 29, 2014 IEP, Parents asked several times, both before and after school started, for a copy of it. Finally, on October 6, 2014, the District sent Mother a draft of the IEP. The next day, Mother wrote back, saying that the IEP, which was an amendment of the May 4, 2014 IEP, had all of the changes discussed at the August 29, 2014 IEP meeting. Mother informed the District that she therefore approved of the draft. The District then issued the IEP. Ms. Ewing received a copy of the IEP during the first week of October. According to Parents, however, Ms. Bound never received a copy of the IEP.

By not having the IEP finalized and in place by the date that school started during the first week of September 2014, the District violated the IDEA. Moreover, by not distributing the IEP to the responsible teachers and providers by school start, the District violated the IDEA. The clear intention of the regulation is that the IEP be fully in place and that all responsible parties be aware of their respective responsibilities.

However, Parents did not demonstrate harm to Student as a result of the delay. Although Ms. Ewing did not provide the required SDI to Student, Parents did not prove that the delay in

---

[20] OAR 581-015-2220(1)(a) and 581-015-2220(3)(a) contain the same requirements.

finalizing the IEP or in giving it to Ms. Ewing was the reason for the non-implementation. Indeed, even after receiving the August 29, 2014 IEP, Ms. Ewing did not implement the SDI. In fact, as discussed earlier, Ms. Ewing did not implement the required SDI for the entire school year. Thus, Parents did not establish a connection between the delay in Ms. Ewing obtaining the IEP and the SDI non-implementation.

Similarly, Parents did not show that the delay in finalizing or distributing the IEP was the reason that Student did not get counseling until December 10, 2014. Although Ms. Ewing expressed confusion to Mother about whether counseling was SDI or a related service, Ms. Ewing was not responsible for arranging counseling; the District had that responsibility. And, the reason for the delay in counseling was unrelated to the IEP finalization or distribution. Student's counseling was delayed because the person arranging it, Ms. Clark, was working reduced hours because of health problems.

With regard to Ms. Bounds' non-receipt of the IEP, Parents did not show any resulting harm. Parents claim that there was confusion about whether Ms. Bounds was required to write progress reports under the IEP. However, as Parents concede, Ms. Bounds was never responsible for such reports because she was providing a related service and not SDI. Student's IEP did not require progress reports on related services. Moreover Parents offered no evidence indicating that the services that Ms. Bounds provided to Student were deficient in any way.

Moreover, despite the August 29, 2014 IEP's delayed distribution, Student not only accessed his/her education, s/he excelled, earning almost all A grades at AHS during the 2014-2015 school year. The same was true of his/her academic performance in the courses s/he took at the University of Oregon. Student also passed all required state examinations.

Additionally, after Student began working with Ms. Bounds in December 2014, Student had fewer emotional meltdowns. When Ms. Bounds first met Student, s/he was crying one to three times per week and leaving school frequently. As of May 2015, Student stopped leaving school because of emotional meltdowns.

And, although Student had a significant number of absences at AHS, by the last term, his/her attendance improved. During the last term, which went from April 2015 to June 2015, Student only had six absences. Significantly, Student's absences during the 2014-2015 school year did not delay his/her anticipated graduation in the summer of 2016. Student could have graduated at that time with a regular diploma. However, because s/he had dropped a class or two at the University of Oregon, Student had insufficient credits for a university-eligible diploma. Parents therefore decided to delay Student's graduation until December 2016.

Evidence in the record showed that the other two IEPs were in effect when school started. Thus, Student's May 4, 2015 IEP was in place when school started in the fall of 2015. Also, Student's November 12, 2015 IEP was in effect when school recommenced after the winter break. Parents therefore proved no IDEA violation occurred regarding the distribution of these IEPs.

### Inadequate Transitional Assessments and Services

Parents' next argument is that the District failed to use appropriate transitional assessments when developing Student's IEP for the 2015-2016 school year. Parents contend that as a result, the District did not provide adequate transitional services to Student. Because they met their burden of proof, Parents prevail on this claim.

IEPs in effect when students reach the age of 16, as well as their subsequent IEPs, must contain post-secondary goals and transition planning. 20 U.S.C. 1414(d)(1)(A)(i)(VIII). Transition planning is designed to help students develop the skills necessary to achieve the students' after-high-school goals. The planning and implementation process is at least a five-year process, beginning when the student is 16 and continuing until the student is at least 21.[21]

The IDEA mandates:

> (VIII) beginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter—[the IEP's must include]:
>  (aa) appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills;
>  (bb) the transition services (including courses of study) needed to assist the child in reaching those goals; and

20 U.S.C. 1414 (d)(1)(A)(i)(viii)(aa) and (bb).[22]

Transition services prepare disabled students for life after high school, and should be:

> Designed to be within a result-oriented process, that is focused on improving academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation.

20 U.S.C. § 1401(34)(A).

Transition planning begins with students articulating post-high school objectives. Student's May 5, 2015 IEP states that Student was interested in attending college, finding a part-

---

[21] IEP Transition planning requires a separate, although related, analysis from the one required for transitional SDI.

[22] Oregon law has the same requirements. OAR 581-015-2200(2)(a)-(b)

time job, and living independently.  As Dr. Sherman, Student's transitions expert, testified, the next step in transition planning was for Student's IEP team to assess Student's current abilities to reach his/her objectives.

The IDEA mandates no specific transition assessment tools.  As Dr. Sherman, testified, such tools vary between commercially-available career interest surveys and research by teachers of specific colleges' entrance requirements.

In assessing Student's present levels of transition performance, the IEP team interviewed Student.  However, the IEPs for the 2014-2015 school year, do not include an assessment of Student's ability to reach his/her post-secondary education objectives.  Instead, under the heading "Results of age-appropriate transition assessments," the IEPs reiterate Student's post-high school objective:  "[Student] has indicated [s/he] would like to attend Southern Oregon University or another school that has a strong science and theater program."

The final component in transition planning is to identify high school studies that would assist Student in achieving his/her post-secondary objectives.  The IEP team referenced AHS finance and career transitions classes, as well as participating in career day and visiting a local community college.

When reviewing an IEP's sufficiency, the IEP is analyzed according to the "snapshot" rule.  *J.W. ex rel J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 421, 439 (9th Cir. 2010).  Under this rule, an IEP provides a FAPE it if complies with the IDEA and was reasonably calculated to provide educational benefit to the student at the time it was written. (*Id.* at 450.)

Student's 2014-2105 IEPs indicate that student was interested in attending both college and graduate school.  However, the District used no transition assessments in determining how student could realize those goals or his/her ability to achieve them.  For example, the District did not assess when and how student could apply to college or whether student had the skills necessary to complete college applications.  As a result, Student proved that the District violated the IDEA by not using adequate transition assessments.  *See, e.g., Forest Grove,* 63 IDELR 186-187 (D. Or. 2014)(Transition plan violated IDEA because a brief discussion with the student about his interests for the future was not a formalized assessment allowing the school to facilitate the student's exploration of career paths.)

Parents showed that this procedural violation harmed Student.  The faulty transition assessments resulted in the formulation of inadequate transition services.

In *Browell v. Lemahieu,* 127 F. Supp. 2d (D. Haw. 2000), a court explained the type of transition services that comply with the IDEA.  In that case, an eighteen-year old's IEP plan included goals for completing high school, engaging with the community through a church group, exploring careers, talking to vocational counselors, and identifying community colleges in his area.  The school gave the student a career test, visited two community colleges with him, provided him information about getting ready for and enrolling in college, and explained what courses he should take in college.  The court found that the services in student's IEP were reasonably calculated to help the student achieve his after high school goals. (*Id.* at 1126.)

Unlike in *Browell*, the only transition services that the District offered to Student were AHS' two sets of transitions classes, as well as attendance at a local college's career day. As explained earlier in this Final Order, the transition courses were not unique to Student but were generic courses offered to all of AHS' students. As such, these classes were not designed to help Student reach his/her post-secondary education goals. The two sets of classes did not qualify as transitions SDI or transition services. And, while the career day visit was an appropriate service, it was insufficient by itself.

The District argues that Parents are barred from raising the transition assessments because it challenges the development of Student's 2014-2015 IEP. The District contends that Parents did not raise this issue in their due process complaints.

However, the transitions assessment issue is identified in a notice issued to the parties by ALJ McGorrin after a prehearing conference. In the January 15, 2016 Amended Notice of Hearing & Rights, one of the issues for the due process hearing is stated as:

> District failed to use appropriate and adequate transitional assessments, and failed to provide appropriate and adequate transitional services to Student during the 2014-2015 school year.

### Failure to Include Agreed-Upon IEP Goals in Student's 2014-2015 IEP

Parents' final claim is that Student's May 2015 IEP did not include goals that the IEP team agreed on. Here, Parents proved both that the IEP was missing the goals, and that the omission caused harm to Student. Parents therefore prevail on this claim.

After reviewing a draft of the May 5, 2015 IEP, Mother wrote to the District complaining that Student's transition goals were inadequate. Mother asked that the IEP include detailed transition goals for Student.

In response, the IEP team created goals of preparing to take the SAT and/or ACT examinations, of writing a resume, and of completing at least five college applications. Although Ms. Bounds agreed on cross-examination that goals contemplated in IEP meetings are not always included in final IEPs, she did not testify that was the case here.[23] Instead, both Mother and Ms. Bounds testified that the IEP team had decided that the goals should be added to Student's IEP. Ms. Keyworth's recording of the goals in her notes of the IEP suggests that the team intended to include the goals in Student's IEP.

Additionally, the District witnesses offered no explanation for the omission of the goals in the final IEP. For example, the witnesses did not testify that the IEP team decided to defer the goals until a subsequent IEP or substitute them for other goals. A reasonable inference

---

[23] The District claims in its Post-Hearing Brief that Ms. Bounds conceded at the due process hearing that the goals might have been discussed but not adopted by the IEP team. Ms. Bounds made no such admission. Instead, Ms. Bounds testified that the team had adopted the goals. (Test. of Bound; tr. at 954.)

therefore can be drawn from the evidence that the goals were inadvertently omitted from the final IEP.

**REMEDY**

Hearing officers have broad powers to fashion remedies which will help compensate students for school district's violations of IDEA.  According to the Ninth Circuit:  "Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the [IDEA.]"  *Student W. v. Puyallup Sch. Dist.*, 31 F.3d 1489, 1496-97 (9th Cir. 1994) (citations omitted.)  *See also, Park ex rel. Pak v. Anaheim Union High*, 464 F.3d 1025, 1033 (9th Cir. 2006) (hearing officers have discretion in crafting appropriate remedies).

In their post-hearing brief, Parents request that Student be awarded the following compensatory education to make up for SDI that s/he did not receive under the August 29, 2014 IEP:  60 hours of compensatory transitional SDI,  35 hours of compensatory organizational and study skills SDI,[24] and 80 hours of social and behavioral skills.  Given the District's material violation of the IDEA, this remedy is reasonable.

With regard to the District's failure to use adequate transitional assessments during Student's 2015-2016 school year, Parents request that the District be ordered to use such assessments to develop adequate goals.  Given the District's failure to use such assessments, this remedy is reasonable.

With regard to the missing goals from Student's IEPs for the 2015-2016 school year, Parents ask that these goals be included in Student's IEP.  Given the District's failure to include these goals, this remedy is reasonable.

---

[24] Parents do not request the entire 45 hours of organizational/study skills SDI required by Student's August 29, 2014 IEP because Student received 10 hours of such instruction from outside consultants hired by Parents.  The District has reimbursed Parents for the cost of this instruction.  (Parents' Post-Hearing Brief at page 70, footnote 9.)

**ORDER**

Parents have shown by a preponderance of the evidence that the District did not provide Student with a FAPE as required under IDEA.  **Accordingly, it is ordered that:**

(1)  No later than June 27, 2016, the District will do the following:  The District will conduct a transitional assessment of Student using two assessment tools recommended by Dr. Sherman.[25]  The District will convene an IEP team to formulate transition goals based on the information provided by the assessment.  The IEP team will issue an amended IEP of Student's then current IEP.  The amended IEP, which must fully comply with the IDEA, must contain a description of the assessment and its results, and new transition services based on the assessment. The District must provide the new transition services to Student before s/he graduates from high school.  If deemed appropriate as a result of the assessment, the amended IEP will include the following transition goals:  apply to take the SAT and/or ACT examinations, develop a plan to prepare for the examinations, prepare for the examinations, write five resumes, and complete five college applications.  If the IEP team concludes that these goals are obsolete or not appropriate, the IEP team will formulate new transition goals for Student.

(2)  Between the date of this Order and when Student graduates from high school, the District will provide Student one hour of counseling per month by Monica Bounds or another provider acceptable to Parents and Student.

(3)  Between the date of this Order and when Student graduates from high school, the District will provide Student 60 hours of SDI in transitions, 35 hours of SDI in study/organizational skills, and 80 hours of SDI in behavior/social skills.  The SDI must be delivered to Student by a licensed special education teacher.  The SDI must be provided in a one-on-one setting in a self-contained area that is separate from a general education classroom.

(4)  No later than June 27, 2016, the District will provide Parents with a written progress report regarding Student's progress toward his/her then current IEP annual goals.  The progress report must list each of Student's annual goals, and address his/her specific progress toward each goal.  After Student returns to high school in the fall of 2016, the District must provide Parents written progress reports on or before October 17, 2016, November 17, 2016 and December 16, 2016.

---

[25] If for any reason Dr. Sherman is unavailable, the parties will select a mutually agreeable expert on transition to select the transitional assessments.  The District will pay for the time of Dr. Sherman or the other expert.

(5)  No later than June 27, 2016, the District will provide Parents with a written report on how Student's then current BSP was implemented during the 2015-2016 school year, and whether or not the plan made a difference during the 2015-2016 school year in controlling the behaviors described in the BSP.  If the BSP was not adequately controlling the problem behaviors, the District will revise Student's BSP and implement the changes before Student returns to high school in the fall of 2016.  After Student returns to high school in the fall of 2016, the District must provide Parents written BSP reports on or before October 17, 2016, November 17, 2016 and December 16, 2016.

_____
Denise M. McGorrin
Administrative Law Judge
Office of Administrative Hearings

**APPEAL PROCEDURE**

**NOTICE TO ALL PARTIES**: If you are dissatisfied with this Order you may, within 90 days after the mailing date on this Order, commence a nonjury civil action in any state court of competent jurisdiction, ORS 343.175, or in the United States District Court, 20 U.S.C. § 1415(i)(2).  Failure to request review within the time allowed will result in **LOSS OF YOUR RIGHT TO APPEAL FROM THIS ORDER.**

**ENTERED** at Salem, Oregon this 11th day of May, 2016 with copies mailed to:

Jan Burgoyne, Oregon Department of Education, Public Services Building, 255 Capitol Street NE, Salem, OR 97310-0203.