**BEFORE THE STATE SUPERINTENDENT OF PUBLIC INSTRUCTION**

| | | |
|---|---|---|
| In the Matter of Eugene 4J School District | ) | FINDINGS OF FACT, |
| | ) | CONCLUSIONS, |
| | ) | AND FINAL ORDER |
| | ) | Case No. 13-054-035 |

## I. BACKGROUND

On December 5, 2013, the Oregon Department of Education (Department) received a letter of complaint from the parent (Parent) of a student (Student) residing in the Eugene Public School District (District). The Parent requested that the Department conduct a Special Education investigation under OAR 581-015-2030. The Department confirmed receipt of this complaint on December 6, 2013 and provided the District with a copy of the complaint letter on December 6, 2013.

On December 10, 2013, the Department sent a *Request for Response* (RFR) to the District identifying the specific allegations in the complaint to be investigated and establishing a *Response* due date of December 24, 2013. The District submitted its timely *Response* to the Department on December 24, 2013 but failed to remit the same materials to the Parent on December 24, 2013. The District's *Response* included a narrative response and the following documents:

1. Emails pertaining to Student dated November 2012
2. Emails pertaining to Student dated January 2013 through October 2013
3. Writing assignment of Student, dated October 25, 2013
4. Emails pertaining to Student dated December 2013
5. Student attendance records
6. Student grades, transcript and class withdraw record
7. Notes pertaining to Student
8. Records from Student's previous school

The District provided its *Response* to the Parents on January 10, 2014. The time for the Parents to *Reply* to the District's *Response* was extended seven (7) days to January 17, 2014. The Parents submitted email correspondence between themselves and the District; the investigator considered only the emails that were written and received within the applicable date range of this Complaint (i.e. December 6, 2013 through December 5, 2014). The Parent did not submit a written reply to the District's initial response.

The Department's complaint investigator determined that on-site interviews were required. On January 10, 2014, the Department's investigator interviewed the following District staff: former guidance counselor for the Student, Assistant Principal for the high school and, Director of Special Education for the District. The Investigator also interviewed the Student and the Parents. The Department's complaint investigator reviewed and considered all of these documents, interviews, and exhibits in reaching the findings of facts and conclusions of law contained in this order.

Under federal and state law, the Department must investigate written complaints that allege IDEA violations that occurred within the twelve months prior to the Department's receipt of the complaint and issue a final order within 60 days of receiving the complaint; the timeline may be extended if the District and the Parent agree to extend the timeline to participate in mediation or if exceptional circumstances require an extension. This order's timeline was extended by seven

days due to exceptional circumstances, namely to allow Parent time to reply after receiving District's *Response* materials late. This order is timely.

## II. ALLEGATIONS AND CONCLUSIONS

The Department has jurisdiction to resolve this complaint under 34 CFR § 300.151-153 and OAR 581-015-2030. The Parent's allegations and the Department's conclusions are set out in the chart below. These conclusions are based on the Findings of Fact in Section III and the Discussion in Section IV. This complaint covers the one-year period from December 6, 2012 through December 5, 2013.

| | Allegations | Conclusions |
|---|---|---|
| | **Allegations to be investigated.**<br><br>The written complaint alleges that the District violated the IDEA in the following ways: | |
| 1 | **Child Find.**<br><br>Parent alleges that the District failed to identify and evaluate the Student for Special Education after Parent's request for evaluation.<br><br>OAR 581-015-2080, 34 CFR 300.111(a) and (c). | **Substantiated.**<br><br>The District had reasons to know or suspect that the Student was in need of Special Education services and failed to identify or evaluate the Student, thus failing its Child Find duty to identify, locate, and evaluate all resident children with disabilities who are in need of Special Education or Special Education services. |
| 2 | **Initial evaluation.**<br><br>Parent alleges that the District failed to evaluate and determine whether the Student was eligible for Special Education services.<br><br>OAR 581-015-2100, OAR 581-015-2105, 34 CFR 300.301(b) and (c). | **Substantiated.**<br><br>The Parents remitted two separate requests for evaluation and an IEP pursuant to OAR 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(2) after obtaining a diagnosis of Autism Spectrum Disorder (ASD) for the Student. The District did not respond regarding whether the request for evaluation was denied nor did District provide the Parents a Prior Written Notice (PWN), information on an evaluation, information on IDEA eligibly, or an evaluation consent form. The District subsequently did not commence evaluation planning or complete an initial evaluation within 60 days of receiving written Parent consent. |

| 3 | **FAPE.** | **Not Substantiated.** |
|---|---|---|
| | Parent alleges that the District failed to provide Special Education services to the Student and that the District failed to initiate an IEP resulting in a denial of FAPE.<br><br>OAR 581-015-2040, 34 CFR 300.101. | The District did nor refer the Student for a comprehensive evaluation through its Child Find process. Thus it foreclosed the opportunity at that time to determine if the Student was a child with a disability under IDEA who needed special education and related services in order to obtain a free appropriate public education, (FAPE.)<br><br>Therefore, due to the fact that there is inconclusive evidence to show that the Student was in need of any Special Education or related services during the times in question, the allegation is not substantiated. |

| | **Requested Corrective Action.** | See Corrective Action. |
|---|---|---|
| | The Parents are requesting that the District begin the process of evaluating the Student for Special Education services. | |

### III. FINDINGS OF FACT

1. The Student is 17 years old and currently in the 11th grade.
2. The Student transferred into the District in the fall of 2012 and was classified as a sophomore upon enrollment. The Student did not receive Special Education services at Student's former schools.
3. Prior to attending the school, the Student was sexually assaulted while on school property at a formerly attended school. This assault occurred in a different school district.
4. The Student reportedly suffers from depression, Post Traumatic Stress Disorder (PTSD) and anxiety as a result of the sexual assault. The Student has been diagnosed as having Autism Spectrum Disorder and Pre-Menstrual Dysphoric Disorder (PMDD). The District received the Student's first set of records on or about September 18, 2012. The District made another request for more Student records from the previous district including, but not limited to attendance records, disciplinary history, and attendance history. The District received a cumulative file on the Student on or about April 4, 2013 from the previous school.
5. Throughout the Student's career at the high school, the Student failed to attend the majority of classes and has been dropped from Geometry, Biology, and Japanese II due to the Student's inability to regularly attend classes. During the Student's sophomore year, the Student received passing grades for US History and Japanese I. The Student failed Honors English as well as Drama. The Student has attempted to complete 11.96 credits toward graduation but has only completed 5.38 credits. The Student needs 14.62 credits to graduate. The Student's current GPA is 0.864.
6. The Student would spend a majority of class time while at school either in the nurse's office, in the bathroom, or walking off campus. The Student regularly engages in "escapism" to cope with school.

7. When a student is absent from class, it is the policy of the high school to send an automated call to the parents informing them of the absence. The high school does not currently engage in any disciplinary measures, such as detention, to ensure that students attend class and do not skip school. The Parents requested they not be contacted by the automated system for attendance, therefore, they have not known whether the Student was actually attending classes or not. Additionally, there was no disciplinary history, of which the Parents would be aware, when the Student "cut" class.

8. During the second semester of the Student's sophomore year, the Student was out of school almost continually from January through March of 2013 due to a reported Student illness, mononucleosis. The Student's family claimed they did not have medical insurance during this time; therefore, it was not possible to obtain a physician's excuse for these absences The Student's father contacted the Student's teachers in an effort to keep the Student current in the Student's studies during this time.

9. On March 3, 2013, the District sent a truancy officer to the Parent's home regarding the Student's prolonged absence from school.

10. During the Student's prolonged illness and absence in early 2013, the Parent requested a 504 meeting for the Student to obtain some accommodations for the Student given the Student's health concerns. The Parents requested home based instruction to be provided to the Student but without a physician's letter for home hospital instruction, this was not possible.

11. A 504 meeting was held on or about March 22, 2013 but no 504 plan was developed because, according to the District, the 504 accommodations would not be applicable if the Student were not present on campus. No 504 plan was ever adopted for the Student.

12. When the Student was first registered in the District, the Parent disclosed to the Student's guidance counselor that the Student had attempted suicide in 2012.

13. The Student's former guidance counselor also referred to the Student as a "fragile kid" during District interviews and noted that other students in the Student's class referred to Student by adding the prefix of "weird" to Student's name.

14. During school days, the Student would spend a great deal of time at the nurse's office.

15. The regular school nurse referred the Student to the school's pediatric nurse therapist. The therapist repeatedly met with the Student regarding mental health concerns and suicide attempts. The Student disclosed to the therapist that the Student had been hospitalized after a suicide attempt.

16.  During the Student's sophomore year, the Student disclosed to the guidance counselor a very specific plan to commit suicide. The Student described suicidal ideation to school staff. The guidance counselor did not refer the Student to any outside therapy at this time and did not take any other action on behalf of the Student. Further, the Parent disclosed to the guidance counselor that the Student was taking anti-depressants.

17. At the end of the 2012-2013 school year, the Parents obtained health insurance for the Student and they also obtained a mental health diagnosis for the Student at this time.

18. On May 10, 2013, the Student's father contacted the District via phone and requested an IEP meeting for the Student. The Student's father also followed up the phone request with an email request on the same day. The Student's father disclosed that the Student had a diagnosis of Autism Spectrum Disorder (ASD).

19. In response to the Parent's request, the District responded via email to the Student's father on May 10, 2013, stating that the Student was not currently eligible for Special Education services. The District stated that "[i]n order to move forward with an evaluation for Special Education, we follow a process of looking at progress for [the Student].  The team will begin here and contact you to let you know what next steps would be."

20. On May 10, 2013 the District contacted the Special Education staff at the high school regarding the Student. The Special Education teacher responded that a follow up on the Student would be performed. From May 10, 2013 through May 15, 2013, the staff at the high school was in email contact with each other regarding what course of action should be taken

regarding the Parent's request. The Assistant Principal stated that the problem was that the Student did not attend school and that the Parents seem very comfortable with that.

21. The Special Education consultant assigned to the high school was reportedly on a six-week leave of absence during May of 2013, so the District did not convene a meeting regarding the Parent's request for an evaluation.

22. The District would have normally discussed the Parent's request at a Support Services Team (SST) meeting. These meetings are regularly held on Mondays and they include multidisciplinary building staff who have concerns regarding student's in need of additional support. The SST meeting, at the Parent's request, would normally have been held on the Monday following the Parent's request. The high school staff stated that no SST meeting was held for the Student in reference to the Parent's request, although the Student was noted for discussion on the SST agenda dated May 20, 2013. However, staff said in interviews that the Student was not discussed at this time, and there is no further documentation showing the team discussed the Student's needs.

23. On or about October 25, 2013, the Student submitted an essay in English class which discussed the Student's troubled mental state, the sexual assault which occurred at the previous school, school anxiety, and bullying episodes.

24. On November 4, 2013, the Student's mother emailed the District requesting an update on their requests for an IEP meeting for the Student.

25. On November 12, 2013, the Student reported going to the counseling office due to feeling suicidal once more. The Student's guidance counselor spoke with suicide hotline volunteers before speaking at length with the Student regarding the Student's request for help with mental health and with other health concerns. The Student disclosed that the Student feels episodes of PTSD when on school property related to the past sexual assault that occurred at a previous school. The Student also stated that the Student felt "picked on" or targeted by other students and that sometimes these incidents would became confrontational.

26. As a result of this discussion, the Student's current guidance counselor contacted the Student's father and relayed the Student's concerns regarding mental health. The guidance counselor also gave the Student a list of mental health agencies that Student could contact if that was necessary, as well as the "Quick Response" services offered by some clinics.

27. After the Parent's November 4, 2013 email to the District regarding an update for an IEP, the District employees once more began an internal email discussion regarding the approach to take with the Student and Parents.

28. In November 2013, the Assistant Principal and teachers were aware of the Student's mental health concerns, noting the Student "is struggling significantly with attendance and managing life events at this moment." The District further concurred with the fact of the Student's school based anxiety, stating "[The Student} stated [the Student] has PTSD around school and it actually really seems to be like that [for the Student].

29. The District did not schedule an SST meeting for the Student in November or December of 2013 nor did it respond to the Parent's November 2013 inquiry regarding an IEP for the Student.

30. On December 5, 2013, the Student was withdrawn by the District registrar for missing ten (10) consecutive days of school.

31. To date the District has never convened any IEP meeting or evaluation planning meeting for the Student. The District has never responded to the Parent's request regarding an IEP for the Student.

## IV. DISCUSSION

### 1. Child Find.

**The Parent alleges the District failed to identify and evaluate the Student for Special Education services after a Parent's request for evaluation. OAR 581-015-2080 and 34 CFR 300.111.**

A district has an obligation to identify, locate and evaluate resident children for Special Education services if the District knows or should have reason to suspect the resident child has a disability, regardless of the severity of the disability, if the child is in need of Special Education or Special Education services.[1] Child Find duties must also include children who are suspected of having a disability, and in need of Special Education, even though the child is advancing from grade to grade.[2] It is irrelevant whether parents make a request for an evaluation in relation to the District's Child Find obligation. See OAR 581-015-2080 and .34 CFR 300.111. The Child Find duty is triggered when the state (or LEA) has reason to suspect a disability, and reason to suspect that Special Education services may be needed to address that disability.[3]" A state or LEA "shall be deemed to have knowledge that child is a child with a disability if (among other things)…the behavior or performance of the child demonstrates the need for such services.[4] Additionally, excessive absences during a school year, poor academic performance, and behavior referrals have been found to "trigger" the requisite district notice to suspect a disability that is associated with the Child Find obligation.[5]

Here, the Student first entered the District at the beginning of the 2012-2013 school year. Upon entering the District, the Parent disclosed to school administration that the Student had attempted suicide earlier in 2012. Thereafter, the Student would regularly visit the school nurse in an attempt to avoid attending classes and, while with the school nurse, exhibited behaviors that caused the school nurse to refer the Student to see the pediatric nurse therapist at the school. The Student had several sessions with the pediatric nurse therapist on staff with the District, reportedly disclosing to the therapist the Student's suicide attempts and subsequent hospitalization.

The Student also reportedly engaged the guidance counselor in conversations regarding emotional problems during the 2012-2013 school year.[6] The Student reportedly disclosed to the guidance counselor a specific plan to commit suicide at home. The Parent also told school staff that Student had previously attempted suicide and was on anti-depressants. The guidance counselor referred to the Student as a "frail kid" and further stated in interviews that most of the Student's grade level peers used a singular derogatory prefix anytime they addressed the Student, in conjunction with the Student's name. This prefix that was commonly used in school, by peers, was a reference to Student's mental or emotional state. School staff were aware of this name. The District failed to take any steps toward having the Student evaluated for Special Education services. The numerous disclosures of the Student's emotional problems (by both Parent and Student) to various school staff should have been ample evidence that the Student should be evaluated for an emotional disturbance or in need of Special Education services under the Child Find requirements of the IDEA. Additionally, there were many other factors that

---

[1] 34 CFR 300.111(a)

[2] See 34 CFR 300.111(c)(1)

[3] *Department of Education, State of Hawaii v. Cari Rae S.*, 158 F. Supp. 2d 1190 (2001), quoting *Corpus Christi Indep. Sch. Dist.*, 31 IDELR 41 at 158, No. 105-SE-1298 (Jan. 19, 1999) and OAR 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, 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.

[4] 20 U.S.C. § 1415(k)(8)(B)(ii)

[5] *Department of Education, State of Hawaii, v. Cari Rae S.; id*, and ODE Final Order 12-054-028.

[6] Note that the counselor could not disclose specific details of the counseling sessions due to confidentiality requirements.

became known to both the guidance staff and the nursing staff that should have also triggered the Child Find obligations of the District.

Into the 2013-2014 school year, the Student was still exhibiting behaviors that would trigger the District's Child Find obligation. The Student handed in an essay for a writing assignment that discussed the Student's anxiety and depression as well as the Student's recurring PTSD that arose from a previous sexual assault which occurred on campus at a previously attended middle school. The essay alone, which was submitted to a teacher, should have given the District a reason to "suspect" the Student could be eligible for Special Education or in need of Special Education services under the IDEA. In November of 2013, the Student reported to a new guidance counselor more thoughts of suicide, depression, and anxiety. The new counselor referred the Student and Parent to outside mental health agencies but did not undertake any actions to begin an identification or evaluation of the Student for Special Education services.

Further, the Student and Parent reported that the Student had two medical conditions which severely impacted the Student's school attendance while enrolled in the District: mononucleosis and Pre-Menstrual Dysphoric Disorder (PMDD). The Student also reported to administrators two bullying incidents that occurred at school. The District once more had notice of the Student's potential need for Special Education or services but did not begin an evaluation or inquiry into whether the Student would be eligible for Special Education services.

Finally, as referenced above, the Student's attendance record shows that a significant amount of school days were missed. The District was on notice that there is a serious attendance problem because the Student apparently engaged in "escapism" many times this school year, , either by remaining in the bathroom during class time or by regularly visiting the nurse's office to avoid being in the classroom.  Additionally, the former school counselor also reported that Student acted out in class by having an "episode" that classmates described as a contrived seizure. Coupling this behavior with the Student's discussion of suicide attempts, the previous sexual assault on school property, the notification of Student's use of anti-depressants and hospitalization, and the Student's apparent anxiety at school and in class would give the District notice that the Student may be in need of Special Education services. Given these factors, the Student should have been evaluated for Special Education services.

Regardless of the timing of the Parent's request for an IEP meeting or evaluation, the District had an ongoing affirmative duty to find, locate, and evaluate the Student as an individual who may have a disability.[7] The District's Child Find duty is not triggered by parent's request; rather the District's duty is also triggered when the District suspects that the child has a disability.[8] The Student presented with the factors detailed above: a history of suicide attempts, sexual abuse, depression and school related anxiety. Therefore, the District's Child Find duty was triggered in numerous ways before the Parent made a specific request for an IEP meeting.

Because the District had reason to know or suspect the Student was in need of Special Education and failed to locate, identify, and evaluate the Student for Special Education services, the District failed its Child Find obligation. Therefore, this allegation is substantiated.

   2. **Initial Evaluation.**

   **Parent alleges that the District failed to evaluate and determine whether the Student was eligible for Special Education services. OAR 581-015-2100, OAR 581-015-2105, 34 CFR 300.301(b) and (c).**

---

[7] Letter to Anonymous, 21 IDELR 998 OSEP (1994)
[8] ODE Final Order 05-054-017, citing *Robertson County School System v. King*, 24 IDELR 1036 (6th Cir. 1996)

A parent may initiate a request for an initial evaluation to determine if the child is a child with a disability. OAR 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(2). If, after a request for an evaluation is received, a District does not feel an evaluation is warranted, the District must provide a Prior Written Notice regarding its refusal to evaluate the child, and this written notice must fully inform parents of their procedural rights.[9] If an initial evaluation is appropriate, it must be completed within 60 school days from receiving written parent consent to the date of the meeting to consider eligibility. A child should be assessed in all areas related to the suspected disability including, if appropriate, screening of health and social and emotional status.[10] Additionally, evaluation planning as part of an initial evaluation for Special Education should include the child's IEP team, including a parent, and other qualified professionals as appropriate.[11]

In this case, the Parent first requested an evaluation both via telephone and via email on May 10, 2013. The request for evaluation was made after the Parent had obtained a medical diagnosis of Autism Spectrum Disorder (ASD) for the Student and the Parent provided this information to the District. Under Oregon law, Autism Spectrum Disorder is an IDEA eligibility category that could entitle a student to Special Education services and which would require specific testing to ascertain whether a student is eligible for Special Education services and to what extent.[12]

In general, it was reported that when the high school would receive a request for a Special Education evaluation, a team of individuals would convene at an SST meeting (on a Monday after the request was made) to begin the process of deciding whether or not an evaluation was warranted. When the Parent's May 2013 request to evaluate the Student was made, a key Special Education consultant was on extended leave. However, the absence of one District employee would not have relieved the District from its obligations for evaluations and evaluation planning under the IDEA. The District should have come to a decision regarding an evaluation for the Student. If no evaluation was merited, the District had an obligation to send a Prior Written Notice to the Parents of its decision not to evaluate the Student, and the District should have described why such a decision was made. Additionally, a copy of the IDEA procedural safeguards rights should have been given to the requesting Parent at this time.[13] If the evaluation was merited, the District had the obligation to remit a consent form to the Parents to begin the evaluation process.[14]

The Parents again requested an IEP meeting in November of 2013 and requested an update on the status of their initial request. At this point, the District did have a full time Special Education consultant on staff, with whom to confer regarding the Student's eligibility for Special Education services. Once more, an internal dialogue convened between various District employees regarding how to handle the Parents' requests, but at no time did the District hold an SST meeting or evaluation planning meeting for the Student. The Special Education consultant did not contact the Parents regarding the requests for an IEP, and more importantly, once more, a Prior Written Notice was not sent to the Parents regarding the District's decision to refrain from evaluating the Student.

Because the District did nothing in reference to the Parents' two requests for a Special Education evaluation of the Student, even after being presented with a medical diagnosis of

[9] See OAR 581-015-2310 and 34 CFR 300.504 and 505 and Memorandum to State Directors of Special Education, 56 IDELR 50 (United States Department of Special Education, Office of Special Education Programs (2011)).
[10] OAR 581-015-2110(4)(d)
[11] OAR 581-015-2115(1)
[12] OAR 518- 015-2130.
[13] OAR  581-015-2315(1)(a)
[14] OAR 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(2).

Order 13-054-035                                                                                    Page 8
                                                                                                Exhibit 3
                                                                                          Page 8 of 11

Autism Spectrum Disorder and notification of hospitalization, and because the District never formally responded to the Parent's requests, this allegation is substantiated.

### 3. FAPE.

**Parents allege that the District Failed to provide Special Education services to the Student and that the District failed to initiate IEP services resulting in a denial of FAPE.**

A Free Appropriate Public Education (FAPE) is broadly defined in the IDEA Part B Regulations as Special Education and related services that are: provided at public expense, under public supervision, and without charge; that meets the requirements of the State education agency, and that are provided in conformity with an IEP that meets the requirements of 34 CFR 300.320 through 300.324.[15] The contours of an appropriate education must be decided on a case-by-case basis, in light of an individualized consideration of the unique needs of each student.[16] The Supreme Court has established a two part test that courts should use to decide the appropriateness of an educational program: 1) has the agency complied with the procedures set forth in the IDEA and 2) has the IEP been developed in accordance with the IDEA's procedures, and is it reasonably calculated to enable the child to receive educational benefits.[17] The Supreme Court has made clear that the IDEA does not require the provision of the best possible education in order for a student to receive a FAPE, but rather FAPE requires that a student receive a "basic floor of opportunity."[18] Therefore, Districts are not required to maximize a student's educational performance in their delivery of FAPE.[19] Each state must ensure that FAPE is available to any individual child with a disability who needs Special Education and related services.[20] Further, eligibility alone, in one of the IDEA's categories of disability, without the actual need for Special Education services, is not sufficient for a student to require services under the IDEA.

The IDEA defines "Special Education" as specially designed instruction, at no cost to parents, intended to meet the unique needs of a child with a disability. Special Education includes instruction conducted in the classroom, the home, hospitals, and institutions and other settings as well as physical education instruction.[21] The unique needs of students are broadly construed to include academic, social, health, emotional, physical and vocation needs.[22]

In this case, the record does not show that the Student was eligible for Special Education services because the Student was never evaluated for said services. Student did show a need for such services as related to behavioral concerns which impacted the Student's academic performance. However, the Student did not have an IEP in place and the District had not taken the referral, evaluation, and eligibility determination steps that may lead to an IEP.

To be eligible for services under the IDEA a student must both be evaluated and eligible for services along with demonstrating a need to receive Special Education or services. In this case, the District did fail to evaluate the Student; however, the Parent failed to send the Student to school or to alternately find another more appropriate venue to assure the Student could attend classes or receive instruction.[23] The record also shows that Parent is often combative or

---

[15] See 34 CFR 300.17

[16] *Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. V. Rowley*, 553 IDELR 656 ( U.S. 1982).

[17] Id,

[18] Supra.

[19] See *J.L. v. Mercer Island School District*, 55 IDELR 656 ( U.S. 1982).

[20] 34 CFR 300.101(c)(1)

[21] See 34 CFR 300.39

[22] See *County of San Diego v. California Special Educ. Hearing Office*, 24 IDELR 756 (9th Cir. 1996).

[23] Note that compulsory education laws apply to students in Oregon between the ages of 7-18 years who have not

adversarial with school staff and will not take phone calls regarding the Student's unexcused absences. Arguably, this student is not receiving the basic floor of educational opportunity" as the student is unable to attend classes or receive instruction. However, this lack of opportunity could equally be caused by either a lack of Special Education and related services (due to a failure to evaluate the student), or likewise due to a lack of regular school attendance and class participation. There is no conclusive evidence that the Student is actually in need of any specially designed instruction or related services in order to receive educational benefit at this time.

While, the District clearly did not comply with the procedural components of the IDEA described above, there is inconclusive evidence in the record that these violations alone, rather than the lack of school or class attendance (derived from matters wholly unrelated to an IDEA eligible disability), have prevented the Student from receiving a FAPE. Based upon the facts as presented, and lack of evidence clearly demonstrating Student's need for IDEA services, there is no conclusive basis to find that the District denied the Student FAPE at this time. If there is a determination of eligibility, then this issue may be revisited within the parameters of the IDEA dispute resolution processes. This allegation is not substantiated.

## V. CORRECTIVE ACTION[24]

*In the Matter of Eugene School District*
Case No. 13-054-035

| Action Required | Submissions[25] | Due Date |
|---|---|---|
| 1) With the informed written consent* of the Parent expedite the planning and completion of the comprehensive evaluation and eligibility determination processes of the Student in this case in accordance with OAR 581-015-2105 through 581-015-2110.<br><br>The District is specifically requested to maintain, and not shred or otherwise destroy, the test booklets, protocols, forms, and related documentation considered, used, or referenced in conjunction with the evaluation and eligibility determination process or in the District's previous | Submit to ODE and concurrently to the Parents:<br><br>1. Written evidence of conferring with Parents to review existing data, including but not limited to:<br> • a list of the type of data reviewed, its sources and dates created,<br> • a copy of the evaluation plan,<br> • a copy of any prior written notices related to the evaluation planning and decisions.<br><br>2. If additional testing is required:<br> • a copy of the written consent<br> • notice of eligibility team | April 4, 2014 |

completed the 12th grade. These students are required to attend school regularly. See ORS 339.010. Additionally, a duty to send children to school is a parental duty which extends to any person having control of any child between the ages of 7-18 who has not completed the 12th grade.

[24] The Department's order shall include corrective action. Any documentation or response will be verified to ensure that corrective action has occurred. OAR 581-015-2030(13). The Department requires timely completion. OAR 581-015-2030(15). The Department may initiate remedies against a party who refuses to voluntarily comply with a plan of correction. OAR 581-015-2030(17), (18).

[25] Corrective action plans and related documentation as well as any questions about this corrective action should be directed to Rae Ann Ray, Oregon Department of Education, 255 Capitol St. NE, Salem, Oregon 97310-0203; telephone – (503) 947-5722; e-mail: raeann.ray@state.or.us; fax number (503) 378-5156.

| | | |
|---|---|---|
| Child Find process regarding this Student.<br><br>*Parents may agree or not agree to an evaluation in accordance with procedural safeguards. | meeting,<br>• copy of eligibility determination.<br>• prior written notice related to the eligibility determination.<br>• a copy of the evaluation report. | |
| 2) Provide training in conjunction with ODE on the following topics: referral, Child Find, evaluation, eligibility determination, and response to Parent requests for evaluation to all staff and administrators potentially involved in any aspect of referral through eligibility determination, with special emphasis on the issues associated with referral of students who may have mental health issues. Training will include District responsibility for health assessments and resources for parents without health insurance. | For each session, evidence of completed training, including:<br><br>• Agenda, copy of materials distributed, dated sign-in sheet that includes names, positions, and locations of participants | Due Date:<br><br>Session 1:<br>April 21, 2014<br><br>Session 2:<br>September 15, 2014 |
| 3) OSEP Memo 09-02 requires that following evidence of intervention and correction of noncompliance, the SEA must verify that correction is sustained. In conjunction with this requirement, from September 2014-January 2015, the District must regularly document efforts to correct the noncompliance. | Submit monthly lists of all parent requests for evaluation in the District and provide ODE with evidence of each District response that meets all of the requirements noted in the analysis above.<br><br>A narrative description, no more than one page, of each request and its District response along with details as to how the District's response meets the IDEA legal requirements will be submitted no later than the 1st of the month electronically or via US mail. | September 1, 2014<br>October 1, 2014<br>November 1, 2014<br>December 1, 2014<br>January 1, 2015 |

Dated this 10th day of February 2014


Sarah Drinkwater, Ph.D.
Assistant Superintendent
Office of Learning, Student Services


Mailing Date: February 10, 2014